Leroy LAFOON, Appellant,

v.

The STATE of Texas, Appellee.

No. 51256.

Court of Criminal Appeals of Texas.

Nov. 17, 1976.

Rehearing Denied Dec. 15, 1976.

Ronald W. Aultman, Jerry J. Loftin and Jack S. Neal, Fort Worth, for appellant.

Jerry W. Woodlock, Dist. Atty. and William B. Sullivant, Asst. Dist. Atty., Gainesville, Jim D. Vollers, State's Atty. and David S. McAngus, Asst. State's Atty., Austin, for the State.

OPINION

DOUGLAS, Judge.

This is an appeal from a conviction for the offense of murder with malice. The jury assessed punishment at life. The case was tried in Wichita County after a change of venue from Jack County.

Appellant has set forth eight grounds of error for consideration by this Court. Since the fourth ground challenges the sufficiency of the evidence, we will discuss it first.

This is a circumstantial evidence case, and the record is voluminous. Appellant and three others, Charlotte Hamilton Lafoon, Ralph Brown and Doris Brown, were indicted jointly for the murders of Edith Shores, also known as Edith Rogers and DeAnn Cloninger. A severance was granted and appellant was tried for the murder of Edith Shores.

The evidence before us shows that on the night of April 14, 1971, George Carl Robertson, Edith Shores and DeAnn Cloninger burglarized the house of Ralph and Doris Brown in Fort Worth. Virginia Garrett, a neighbor of the Browns, testified that approximately one week prior to the burglary of the Browns' house she was next door at the Browns' and had observed appellant threaten DeAnn Cloninger with a shotgun. She stated that on the night of April 14, 1971, at approximately 10:00 p. m., as she was getting ready to go to bed, she heard a lot of noise outside. She looked out her window and saw two women and a man. She recognized one of the women because óf her platinum colored hair as the same woman who had been waiting in the car for DeAnn the night DeAnn had been over to the Browns' house with her baby the week before. Then, approximately thirty minutes to an hour later, Doris Brown came over and asked her to come over to their house after it had been burglarized. Doris Brown then called appellant who arrived shortly thereafter at the Browns' home with Charlotte Hamilton.[1] A conversation then took place between the four—Ralph and Doris Brown, appellant and Charlotte

Hamilton—concerning the two deceased women as being the burglars and that they should be killed. One of the two men made a statement that he was going to beat the woman to death with the dead dog. The Browns' pet dog had been killed during the burglary. Appellant said, "Let's all go get 'em." Doris Brown then called Edith Shores after which appellant was heard to say that he wanted to go find the two women before they had a chance to unload any of the things taken. Appellant said he knew the street on which Edith Shores and DeAnn Cloninger lived, and the four then left in his car. Garrett returned to her house. Approximately two hours later they returned and Doris Brown again came over to Garrett's house and asked her if she had seen anything. She returned to the Browns' home. A discussion then took place between appellant and Doris Brown wherein she told him what had been taken in the burglary, a television set, record player, some shortwave radio equipment, a Hoover rug shampooer and a metal box containing some papers. Two days later, April 16th, at approximately 2:00 p. m., appellant accompanied by Doris Brown and Charlotte Hamilton borrowed Garrett's car to go to appellant's apartment for some clothes and to do their laundry. Allegedly their car was not running and, therefore, they needed her car.

About 4:00 p. m., Doris Brown called Garrett and told her that they had located their stolen things and would be late in returning. When Garrett told her that she needed a car, she (Doris Brown) said for her to use hers. Doris further related that she, Ralph Brown, Charlotte Hamilton and appellant were waiting for someone. About 3:00 a. m. the next morning, Garrett heard a car back up to the Browns' house next door. It was her car and in it were appellant, Doris Brown, Ralph Brown and Charlotte Hamilton. She noticed that the car was very muddy. The four were unloading some boxes out of the car and also a television set. When they finished unloading the car, Charlotte Hamilton and appellant left

1. Charlotte Hamilton and appellant were married sometime after this offense occurred.

and Doris Brown came over to Garrett's house and said to her, "About your car; Leroy has gone to wash it; he wouldn't bring it home like that." She described Doris Brown's appearance at the time as ". . . muddy and she had blood on her arm and her blouse. Her arm was all swelled up." She then inquired of Doris Brown, "What in the world happened?" to which Doris replied, "Leroy and I got two of them but we've got one more to go." Two or three days later Doris Brown gave Garrett the tennis shoes and clothes she had been wearing that morning and asked her to get rid of them on her way to California. Doris Brown had also told her that they had found out that there was a third burglar. She said that she had gotten muddy when they (Doris Brown and appellant) had to move a log and she fell. Approximately an hour or so later appellant came to Garrett's house. She described him as being muddy and bloody, with the largest amount of the blood down his back and the most mud on the seat of his pants. Garrett then testified that, while Doris Brown was telling appellant about a little pin cushion that Edith Shores and DeAnn Cloninger had taken, he replied, "Well, it's one thing; they won't ever rob anyone else." She further related that she had to use her car at approximately 6:30 a. m. or 7:00 a. m. and it had been washed. However, she discovered blood on the inside of the car and a child's moccasin was under the front seat of the car. Later that morning, Doris Brown brought over a wig and asked her to dye it. Doris told her that the wig belonged to Charlotte Hamilton. The wig was later identified as actually belonging to Edith Shores, the deceased.

Sam Burroughs, an officer of the Lake Worth Police Department, testified as to the items reported to him as stolen by Ralph and Doris Brown. The list included an eighteen-inch black and white Motorola television; one Realistic high and low band radio; an AM-FM radio; one Savage twelve gauge automatic shotgun; one nine millimeter Browning automatic pistol; one Realistic portable record player, one Hoover rug shampooer; one metal file box containing beads, jewelry and numerous pieces of TV testing equipment. A portion of these items were the same items Garrett had observed being returned to the Browns' house the night her car was used by appellant. These same items were identified by Carl George Robertson as the items he and the two deceased women had taken when they burglarized the Brown house. Robertson also identified some of the items as having been in the possession of the two deceased women. These same items were found back in Ralph and Doris Brown's possession when they were arrested on June 2, 1971. Robertson further testified that after the burglary they had gone back to DeAnn Cloninger's house and while they were there a telephone call was received from Doris Brown. He stated that he next saw the two deceased women at approximately 1:30 p. m., April 16th at the Twilight Lounge. DeAnn had her baby, Gina, with her. Gina was dressed in a little red housecoat and moccasins. He identified State's Exhibit No. 4 which had been found in Virginia Garrett's car as resembling the moccasins Gina had on.

Officer A. E. Bruton of the Fort Worth Police Department testified that at 2:47 a. m. on April 17, 1971, he went to 3100 Wingate to investigate a complaint about a baby crying. He arrived at 2:50 a. m. but was unable to locate the source of the crying. At 3:29 he received a second call to return to 3100 Wingate and make further investigation. He then found a baby in the back seat of an automobile parked in the parking lot two spaces away from the Dempsey Dumpster. The little girl, named Gina, was clad in a red housecoat and had on one moccasin which was similar to the one found in Garrett's car.

Edna L. Kennedy then testified that she and her husband lived in the Wingate Apartments on April 17, 1971, and that both she and her husband worked shift work from 3:30 till midnight; that she and her husband worked until 1:00 a. m. on April 17 and went home. At approximately 2:30 a. m., her attention was drawn to a motor running "[b]ecause it ran longer than most people do when they drive up, tell someone

goodnight, then they go on." She pulled the drapes back and observed a man looking at cars in the parking lot and attempting to get into them. Then she saw him open up the left rear door of a car parked in the second space away from the trash dumpster and then walk back to a white car sitting in the parking lot with its engine running. She momentarily quit looking out from behind the drapes. When she looked out again the white car was gone and the door of the car she had seen opened by the man was closed. She further identified the white car she saw as being similar to the car pictured in State's Exhibit 18, Virginia Garrett's car, and identified appellant as looking similar to the man she observed in the parking lot behind her apartment on April 17, 1971.

Troy Thornburg testified that on April 24, 1971, while he and his family were fishing at a stock tank in Jack County, they found a body floating just under the surface. He then notified Sheriff Hubert Jackson. When Sheriff Jackson arrived on the scene, he observed a huge log across the end of the stock tank and between the body that was found on April 24, 1971, and the shore. He testified that the body was badly decomposed and that rocks had been tied to the neck and legs and the hands were tied behind the back. He found evidence of a car having been driven to within approximately one hundred yards east of the stock tank and stopped. The dark red spots were found on the ground near where the car had stopped; chemical analysis later proved this to be human blood. Also some jewelry and a St. Christopher medal belonging to the deceased woman were found. The following day Sheriff Jackson returned to the stock tank and saw a second body floating in approximately the same spot as the first body had been found. This body had two pieces of metal automobile frames attached to it, one piece attached to its hands that were tied behind its back and one piece attached to its legs that were tied with baling wire. The second body was identified as Edith Shores by fingerprints and by family identification. The stock tank was drained and it was observed that there were footprints all out in the stock tank which looked like a man's footprints and there was mud up to a foot deep in the bottom of the tank. It had rained there approximately one week before the bodies of DeAnn Cloninger and Edith Shores were found.

DeAnn Cloninger's car had been found abandoned in a hospital parking lot in Weatherford. Hair and blood were found on the jack in the trunk. Additional soil analysis tests on the muddy footprint in her car and Garrett's car proved to be from the same location.

David Brown and William Godwin, appellant's half-brothers, testified that they had been drinking and playing pool at the Stardust Lounge the evening of April 16, 1971, with appellant, Ralph and Doris Brown and Charlotte Hamilton until 2:00 a. m. the 17th of April at which time they all went over to appellant's apartment which was nearby. They testified that they all remained at appellant's apartment until 3:30 or 4:00 a. m. and then went home.

■ Appellant argues that the overall testimony casts doubt on the credibility of the witness, Virginia Garrett. He put on witnesses to attempt to discredit her; the State called rebuttal witnesses. There are contradictions in the testimony. The jury is the exclusive judge of the credibility of the witnesses and of the weight to be given their testimony. Article 36.13 and Article 38.04, V.A.C.C.P.; *Hopkins v. State,* 480 S.W.2d 212 (Tex.Cr.App.1972). The jury may believe some witnesses and refuse to believe others and it may accept portions of the testimony of a witness and reject other portions. *Esquivel v. State,* 506 S.W.2d 613 (Tex.Cr.App.1974). The jury here obviously chose to believe the State's testimony. Viewing the evidence in a light most favorable to its verdict, as we must, it is sufficient to support the jury verdict.

■ Appellant contends in his first ground of error that the trial court erred in not granting his "request for order of trial." He argues that under Article 36.10, V.A.C.C.P., he and his co-indictees have an absolute right to request such order and

have it granted where all d ndants are agreed when severance has ' en granted.

We have examined appellant's motion as it appears in the record and find that while it is signed by the four indictees, it asks for no specific order of trial except that appellant's wife, Charlotte Hamilton Lafoon, be tried first. Article 36.10, supra, was not followed. In view of this we find that there has been no agreed order of trials and thus no abuse of discretion by the trial court in denying said motion. See *Harris v. State,* 172 Tex.Cr.R. 150, 354 S.W.2d 155 (1962).

■■■ next, appellant contends that the trial court erred in failing to include in its charge to the jury an instruction concerning the law of accomplice testimony as applied to the witness Virginia Garrett. The court did not charge on accomplice testimony, either as a matter of law or as a question of fact for the jury. If all the evidence shows that the witness is answerable to the law as a principal or an accomplice to the crime or an accessory to the accused or if he has been indicted as such, then he is an accomplice witness as a matter of law. If there is a conflict in the evidence, then the question should be submitted to the jury. But, if there is not enough evidence to support a charge against the witness as either a principal, an accomplice or an accessory, then he is not an accomplice witness. *Silba v. State,* 161 Tex.Cr.R. 135, 275 S.W.2d 108 (1954). Garrett was not an accomplice and no such charge was required. *Hendricks v. State,* 508 S.W.2d 633 (Tex.Cr.App.1974).

We have reviewed all of the evidence and find that it is insufficient to support a charge of any type against Garrett. She gave the clothing that Doris Brown had asked her to throw away to the officers. In fact, the evidence overwhelmingly shows that Garrett was not an accessory as it is replete with times when she aided law enforcement officials in obtaining evidence. The court did not err in refusing to submit a charge on an accomplice witness as a matter of fact. See *Easter v. State,* 536 S.W.2d 223 (Tex.Cr.App.1976). Ground of error number two is overruled.

■■■ In ground of error number three appellant contends that the trial court erred in admitting the testimony of Texas Ranger Jesse Priest concerning statements made to him by Garrett's daughter, Suzann Wren.

Initially, Suzann Wren was placed on the witness stand by appellant in order to impeach the credibility of her mother, Virginia Garrett. She testified that statements made to her by her mother were inconsistent with statements that she (Garrett) had made before the jury. During cross-examination of Wren, she admitted that she told Ranger Priest what statements Garrett had made to her concerning the defendants, but it does not appear that she unequivocally admitted that she had made prior inconsistent statements to Ranger Priest concerning her jury testimony. Thereafter, Priest was called to testify that the statements made by Wren before the jury were also inconsistent with those statements told to him. This testimony was properly admitted by the court. It is the rule that, where a prior inconsistent statement is made on a matter material to the case, the witness may be impeached by evidence of the inconsistent statement from other witnesses of the inconsistent statement. *Thrash v. State,* 500 S.W.2d 834 (Tex.Cr.App.1973). Wren's testimony contains several inconsistencies within itself, but no positive admission that she had made certain other statements to Priest with perhaps one or two exceptions. Ground of error number three is overruled.

■ in grounds of error five, six, seven and eight, appellant complains of certain remarks made by the prosecutor during final argument at the guilt stage of the trial. We have reviewed grounds of error five, six and seven and find them to be without merit and they will not be discussed. Ground of error eight complains of the following statement by the prosecutor:

"There's a lot of circumstances I would love to have you people know. I'll guarantee you one thing, you return a guilty verdict in this case and then you go out and make a further investigation and you'll be proud of yourself."

The record reflects that before the argument of the prosecutor was made counsel for the defense made the following statements:

"Now, let me ask you this. If he (Sullivant) wants you to have all of the loose ends; if he really wants you to have all the circumstances, if he really wants you to have this other hypothesis which could reasonably and very likely account for the death of Edith Rogers, I challenge him to take four steps to his left and he'll find them. Four steps from where he's sitting to his left and he'll—

and

"I say to you if you want to hear all of the loose ends ____ I say to you if they're going to ask you to ___ to reach out of the ___ in the bottom of a basket and come up with a verdict of guilty against this man, you should have all of the story. ___"

The court instructed the jury not to consider the argument complained of. No reversible error has been shown. Stronger argument than the one made in this case has been held not to be reversible where there has been an instruction not to consider it.

In *Spaulding v. State,* 505 S.W.2d 919 (Tex.Cr.App.1974), the prosecutor argued, "I wouldn't be up here right now if I didn't think this man was guilty, because . . . ." An objection that the prosecutor was expressing a personal opinion of guilt was sustained. The court instructed the jury not to consider the statement for any purpose. A motion for mistrial was overruled. In the *Spaulding* case this Court wrote:

". . . *Thompson v. State,* 480 S.W.2d 624, 630 (Tex.Cr.App.1972), laid down the following rules:

" 'The test as to whether an improper argument constitutes reversible error is whether, (1) the argument is manifestly improper, harmful and prejudicial, or (2) it is violative of a statute or, (3) it injects a new and harmful fact into the case.'

"These admittedly general rules are subject to certain well-recognized inter-

pretations. One is articulated in *Ramos v. State,* 419 S.W.2d 359, 368 (Tex.Cr.App. 1967):

" 'If the prosecutor's remark can be interpreted as an expression of his personal opinion of the guilt of the appellant, then such argument would be improper. Where, however, an instruction to disregard is not refused, such conduct will not cause a reversal. 1 Branch's Anno.P.C.2d, Sec. 385, p. 406.'

"Another guide to our consideration of such questions is to be found in *Hodge v. State,* 488 S.W.2d 779, 781–782 (Tex.Cr. App.1972), where the court said: 'The question as to whether either of the statements of counsel necessitates a reversal of the judgment is to be resolved on the basis of the probable effect on the minds of the jurors and the facts of each case must be looked to.'

"Even if we concede the prosecutor's statement of his personal opinion of guilt to be improper, the prompt action of the trial court, followed by an instruction to disregard such remarks, removed the harmful effect thereof. No reversible error is shown by such complaint. *Ramos v. State,* supra."

The dissent does not care to consider or discuss the *Spaulding* case, the latest on the subject which cites other cases later than *Bowers v. State,* 171 Tex.Cr.R. 345, 350 S.W.2d 27 (1961).

Ground of error number eight is overruled.

No reversible error having been shown, the judgment is affirmed.

ROBERTS, Judge (dissenting).

This case should be reversed because of the improper argument of the prosecutor, which is brought forward as appellant's eighth ground of error. The prosecutor argued:

"There's a lot of circumstances I would love to have you people know. I'll guarantee you one thing; you return a guilty verdict in this case and then you go out and make a further investigation, and you'll be proud of yourself."

Appellant's objection was sustained, and the jury was instructed to disregard the argument. Appellant's timely motion for mistrial was overruled.

The majority indicates that the argument was merely an expression of the prosecutor's opinion that the appellant was guilty. This overbroad analysis entirely misses the obvious point of the prosecutor's argument: to tell the jury in clear and explicit language that there were known facts not introduced in evidence which would bolster the prosecutor's contention that the appellant was guilty.

The argument in this case is indistinguishable from the argument in *Bowers v. State,* 171 Tex.Cr.R. 345, 350 S.W.2d 27 (1961). There this Court reversed where the prosecutor argued:

> "I am asking you to put him in the penitentiary . . . That's what I'm asking you and I'll stand with you on the verdict, and I want you to come to me and I'll tell you after it's all over that I'll stand with you right down the line and you'll have a different light on this matter."

As in the present case, the objection in *Bowers* was sustained, and the judge instructed the jury to disregard the argument, but a motion for mistrial was denied. This Court held that the argument "was tantamount to telling the jury that if they would vote to convict appellant and then come to see the prosecutor he would tell them something which had not been introduced in evidence and further justify their finding of guilt." *Bowers,* supra, 350 S.W.2d at 28.

The argument in this case is even more explicit than that in *Bowers.* Moreover, the rule applied in *Bowers* is one of long-standing and repeated application. See *Smith v. State,* 94 Tex.Cr.R. 427, 250 S.W. 1025 (1923), and *Harrison v. State,* 102 Tex. Cr.R. 385, 278 S.W. 430 (1925), both relied upon in *Bowers,* as well as *Haggard v. State,* 99 Tex.Cr.R. 354, 269 S.W. 438 (1925); *Brister v. State,* 97 Tex.Cr.R. 395, 262 S.W. 82 (1924); *Puckett v. State,* 168 Tex.Cr.R. 615, 330 S.W.2d 465, 81 A.L.R.2d 1237 (1959); and *Stanchel v. State,* 89 Tex.Cr.R. 358, 231 S.W. 120 (1921).

Finally, it should be observed that the maximum possible punishment was assessed. This makes the following language from *Stanchel* especially pertinent:

> "It was perfectly legitimate for counsel to criticize the failure to produce available evidence, and deduce a conclusion that, if offered, it would not be favorable. But the district attorney in his zeal went further than this court can sanction. We understand that in the heat of debate attorneys for both the state and defendant are likely to violate the rules of argument; but here counsel passed from the domain of argument and conclusion and entered the realm in which a witness only is entitled to move. It was a damaging statement against appellant, and we cannot hold the same to have been harmless, in view of the penalty inflicted." 89 Tex. Cr.R., at 361, 231 S.W., at 122.

The judgment should be reversed.