**Michael Ansara McGEE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 12–88–00275–CR.**

Court of Appeals of Texas,
Tyler.

Aug. 31, 1992.

Opinion Denying Motion for Rehearing
Jan. 28, 1993.

Discretionary Review Refused
April 14, 1993.

Randy Gilbert, Tyler, for appellant.

Amy Blalock, Asst. Dist. Atty., Tyler, for appellee.

## OPINION ON REMAND

RAMEY, Chief Justice.

### PART I

In November of 1990, we delivered an unpublished opinion reversing the conviction in this case and ordering an acquittal. That ruling resulted from our conclusion, following our review of the evidence in the light most favorable to the verdict, that "rational jurors could not have found that the State disproved Appellant's claim of self-defense beyond a reasonable doubt."

The Court of Criminal Appeals by a per curiam opinion vacated our judgment and remanded this cause for reconsideration of the self-defense issue in light of *Saxton v. State*, 804 S.W.2d 910 (Tex.Cr.App.1991). As we read *Saxton*, the reversal and re-

mand of this cause was ordered because we should have analyzed Appellant's sufficiency point of error by determining "whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against Appellant on the self-defense issue beyond a reasonable doubt." *Saxton*, 804 S.W.2d at 914 (citation omitted).

### PART II

Appellant Michael Ansara McGee was convicted of the murder[1] of Howard Scott by a jury who assessed his punishment at sixty-five years and a $5,000 fine. Appellant presents six points of error. Because Appellant challenges the sufficiency of the evidence, we render a comprehensive statement of the material evidence and testimony.

State's witness, Herrod Williams, was present at the murder scene. He testified that Joe Thomas Tucker and the victim came to Hayter's house; that the victim was carrying a pistol; and that the victim went into the house, came back out and began searching for the keys to Greg Scott's truck. Williams also testified that Appellant armed with a rifle then arrived at the house and shot the victim when the victim "raised his head up." Williams stated that he never saw the victim "raise the gun or point that handgun at [Appellant]" and that he did not see the victim "make any kind of movements ... with the gun...." On cross-examination Williams testified that when the victim first arrived at the Hayter house, he said "where is the M—F— F—ing with my brother." Williams also stated that after the victim was shot, he heard "two or three" more shots. On redirect examination Williams stated that the victim, at the time he went into the house, appeared to be "upset and mad" but had calmed down when he came outside to look for the keys. He also testified that Tucker did not have a weapon that night. On recross-examination,

Williams stated that Tucker was "standing out in ... Barnes [street]."

Another State's witness, Darrell Frater, testified that he saw the shooting. He said the victim came to the Hayter house "hollering who is the M—F— that's messing with my brother." The victim then went into the house, came out and began looking for "Gregg's [keys]." Frater testified that the victim, with a pistol in his hand, "had his head down looking for [the keys] with several others, including Tucker." Frater also testified that Appellant then "ran out" from behind a tree and shot the victim. Frater stated that, at the time the shot was fired, the victim had his pistol "down to his side." On cross-examination Frater stated that the victim was still "upset and mad when he came ... out of the house." Frater added that Tucker had parked his car and was standing near it when the shooting occurred.

Atrell Hayter, at whose house the shooting took place, testified that the victim armed with a pistol came to his house looking for Appellant. After Hayter told the victim that Appellant was not there, the victim began searching for the lost keys. Hayter stated that Tucker and a person named Pug (Cary Hudson) were assisting in the search. Hayter said that as the victim was searching for the keys, he walked in a "circle" towards Greg Scott's truck, and "that's when he met with [Appellant]." This witness said he saw Appellant "[step] out from behind Gregg's truck" and then "[the victim] raised his left hand to ask [Appellant] some questions and about that time [Appellant] shot." Hayter also stated that the victim did not "raise up his gun." Hayter heard "two or three more shots" fired approximately five minutes after the fatal shot. Hayter also testified that after Appellant shot the victim, he said, "Joe Thomas, you are next." While Hayter's testimony does place Tucker at the scene at the time of the shooting, Hayter stated that Tucker did not have a gun "out there that night."

Bobby Glen Scott, also saw the shooting and testified that the victim was "bending

---

1. Pursuant to Tex.Penal Code Ann. § 19.02(a)(1) (hereinafter section 19.02).

over" looking for the keys when Appellant arrived, and that the victim "raised up" and Appellant shot him. Scott, however, could not say whether the victim raised his pistol, saying, "[w]ell I really couldn't tell. It was dark." Scott did not see Tucker with a weapon. Scott could not recall Tucker's exact location at the time of the shooting, but stated that Tucker "was out there somewhere."

Tyler Police Officer Richard Don Strickland testified that he found a pistol three or four feet to the left of the body of the victim who was lying face down on the ground. Tyler Police Officer James Cooper testified that the pistol was loaded, and that he found a spent 12–gauge shotgun shell at the scene.

The State also called the victim's mother, Fanny Mae Scott, who testified that the victim was right handed. She identified State's Exhibit 6 as a photograph [2] of her deceased son, Howard Scott. The next State witness, Joe Thomas Tucker, stated that he witnessed a fight between Appellant and Greg Scott on the evening of July 22, 1987. He said that Appellant had chased Greg Scott with a knife and that after the chase, Greg and Appellant exchanged blows, and that Greg struck Appellant on the head with a beer bottle. That blow, according to Tucker, cut Appellant's forehead. Tucker testified that at about that point in time, he and Cary Hudson "jumped down and stopped [the fight]." Tucker related that Appellant broke free and ran to a nearby apartment complex and asked a resident there, "Curtis Moore, give me a gun." Tucker said he then told Greg, "Let's go, let's leave [Appellant is] trying to come back with a gun." Tucker said he and Greg then drove to "White City and found [the victim]." Tucker stated that he and Greg then told the victim about the fight between Appellant and Greg (the victim's brother) and that Greg had left his truck parked at the Hayter house.

Tucker testified that Greg wanted to get his parents to pick up his truck, but the victim said, "I'll handle this." Tucker said the three of them then drove in Tucker's car towards the Hayter house. He said that when he arrived at the intersection of South Glenwood and Vine, Greg jumped out of the car. Tucker testified further that, after Greg got out of the car, he and the victim drove to the Kemp Building, which was located only a short distance from the Hayter house. Tucker testified that he then drove to the Hayter house, and that the victim walked up to the Hayter house with a pistol. He stated that he had never threatened Appellant in any way and said they had "always been best of friends. He just turned against me that night." Tucker related that he never knew of any "troubles or problems between [Appellant and the victim]." Tucker said he did not see the actual shooting. On cross-examination, Tucker testified that the victim "didn't have no gun in his hand. He had it in his pocket." Tucker also stated that Appellant, after he shot the victim, fired some seven shots while standing in the street.

Greg Scott, a brother of the victim, testified that on July 22, 1987, at about 8:00 p.m. he drove his truck to Hayter's house at the intersection of Old Noonday Road and Barnes Street where he had "trouble" with Appellant. Scott stated that he left Hayter's house at about 8:45 p.m. and returned about 10:30 or 11:00 p.m. He said at that time, the Appellant approached him with a knife and threatened to "cut [his] heart out." Scott said he backed up and ran, but that Appellant chased him and "snuck ... up and ... put his arms around my neck." Scott said he then broke loose, "and we started fighting and some guys [Joe Thomas Tucker and Cary Hudson] broke us up." Scott stated that he then started walking home and he saw "three guys running along in the pasture." He stated that Tucker and Hudson were "running alongside ... [Appellant] trying to get him to stop." Scott said he then turned around and walked back to Hayter's house, "hoping to find my keys." Scott explained that he had lost his truck keys during the fight.

2. The exhibit shows the victim lying face up.

Scott then stated that Tucker agreed to take him home, but he and Tucker "ended up going back to where my brother was on Groves Street." He stated that Tucker began talking to the victim, telling him about Greg's altercation with Appellant and that Greg's truck was still parked at Hayter's home. When the prosecutor asked Scott how the victim "reacted to that information," Scott replied, "[w]ell Joe Thomas [Tucker] had talked with him first and he had gotten him riled up." Scott also stated that the victim "was a little upset." Scott testified that he tried to talk to the victim and prevent him from going up to Hayter's house to get the truck keys, and stated, "[b]ut Joe Thomas, he kept riling and urging it up and I couldn't talk to my brother, you know, out of going, out of staying with me." Greg stated that he got into Tucker's car with the victim and they started to drive to Hayter's house. Scott said he got out of the car "at Glenwood and Vine," a location some one and one-half miles from the Hayter residence. However, according to Scott's testimony, as he began to run towards the Hayter house, he heard three shots, "one, then two, and then about another two minutes, the gun went off again." Scott said he then went to a friend's home on Noonday and "told them to call the police."

On cross-examination, Scott explained his use of the words "riled up" to mean "egging [the victim] to fight." Scott also said that Tucker was "trying to agitate a fight, or something else." He said that the victim and Tucker forced him into Tucker's car, and that he was scared. Defense counsel asked Scott, "Were you afraid of getting into a fight or were you afraid of a dangerous situation being precipitated by Joe Thomas Tucker?" Scott replied, "The dangerous precipitation." Scott again stated in effect that Tucker agitated the victim against the Appellant. On redirect examination, Scott testified that the victim went to Hayter's home to retrieve his keys. On recross, however, Scott said that "Joe Thomas [Tucker] was stirring [the victim] up to go back and get [Appellant]."

Appellant produced several witnesses. Paul McGee, Appellant's brother, testified

that he saw Joe Thomas Tucker and the victim at the Kemp Building. McGee said he was looking for Appellant, found him sitting on Barnes Street, and noticed that Appellant was bleeding from his forehead and hand. Some children came by and told McGee in Appellant's hearing "that Joe Thomas [Tucker] and [the victim] were up there behind the Kemp Building and they were looking for [Appellant]." McGee then gave Appellant his 30.06 rifle.

Appellant testified in his own behalf and admitted that the fight took place between himself and Greg Scott. He said he left the scene and began walking to a bootlegger's house to find his father, but when he arrived at that house he observed that his father's car was not there. He stated he then continued walking but because of his head wound he had to rest in the road. He saw his brother, Paul McGee, drive up and related to him the facts about his fight with Greg Scott. According to Appellant, about that time a "crowd of people came up and somebody said [to Paul], 'Joe Thomas and Howard up at the Kemp Building looking for your brother.'" Defense counsel then asked him, "Did they say anything about guns?" Appellant replied, "They said they had guns." Appellant testified at that time he became frightened, saying, "I know if Joe Thomas and Howard had guns looking for me, they was looking for me. I know that Joe Thomas had a gun he was looking for me."

Appellant also testified that Tucker had threatened to kill him about a week before. Appellant stated that his brother, Paul McGee, gave him the 30.06 rifle. Appellant then told his brother to leave and started walking to his father's house. That route apparently took him to the back side of the Hayter home where he said "there are trees and bushes." Appellant testified that when he got to the back of the Hayter house he saw Joe Thomas drive up. Appellant said that he heard the victim's voice coming "from inside the Hayter house," and that the victim said, "Where is Mike McGee at, where is the M—F— at." Appellant testified that the victim also said that "whenever he found me he would kill

me right there." Soon after that, Appellant testified that he "knew Joe Thomas was around there somewhere but I didn't know where he was." He said he saw the victim "come into [his view] ... behind Joe Thomas' [parked] car." Appellant said he then watched the victim turn on the headlights of Greg Scott's truck and then concealed himself between two parked vehicles. Appellant said that he saw the gun in the victim's hand, and as the victim turned toward him, he stepped out from behind the two vehicles and said at that point, the victim saw him and cursed him, and "[raised] the pistol up in his right hand." Appellant stated that when the victim pointed the pistol at him, "I raised my [rifle] and I fired." Appellant related that he then "walked down Barnes Street" to its intersection with Noonday Road where Joe Thomas Tucker shot him with a shotgun. Appellant said that shotgun pellets struck him in his side and he shot back at Tucker after jumping into a ditch.

Appellant was asked by his lawyer, "Why didn't you call the police [before the shooting] if you knew they were looking for you?" In reply, Appellant said, "By the time [the police] got there, they done found me anyway probably by the time [the police] got there." On cross-examination, Appellant again stated that he had been informed that the victim and Tucker were armed with guns and that they were looking for him. He also restated that when he arrived at a location behind the Hayter house, he saw Joe Thomas Tucker drive up, get out of his car and go to "the front of the house," but then he lost sight of him.

David Lee Welch also testified for the defense. He and his employee, Randy Moore, had just finished working and Welch had stopped at the Hayter house so that Moore could speak with his cousin, Mrs. Lillie Belle Hayter. Welch said that when he arrived at the Hayter house he saw "several men running around with shotguns and pistols." When he was asked "who those people were," he replied, "Joe Thomas Tucker and Mr. Scott [the victim]." Welch also said that the victim "was running around" and "[l]ooked like

he was looking for somebody." He stated that Tucker "went around the side of the house." Welch testified that he then got "kind of worried" and departed in his truck with Moore. He said he drove a block or so away and stopped at the house of Moore's brother where the two visited for awhile. He stated that, while they were there, he heard "several gunshots ... got ... curious," and drove back to Hayter's house where he saw the victim's body lying in the street. On cross-examination, Welch testified again that when Tucker got out of his car at Hayter's house "[h]e had a shotgun or rifle or something." He also stated on cross-examination that he heard the victim "holler and he was looking for [Appellant], said he was going to kill him." He also testified on cross-examination that Tucker "put his gun in [the] trunk of his car."

The defense called Randy Moore next. Moore generally corroborated Welch's testimony that the victim was moving around with a pistol in his hand saying, "Where is [Appellant]. Whenever I see him, that's when I'm going to kill him." Moore stated that he did not see Tucker with a firearm. However, Curtis Wayne Moore (Randy Moore's brother), testified that after the shooting occurred, he saw Tucker running with a shotgun at the murder scene.

Appellant's parents, Bennie McGee and Georgia McGee, also testified for the defense. Bennie McGee stated that his daughter "woke [him] up, said [Appellant] was in trouble. I jumped up." McGee stated that he drove to the Hayter house, taking Curtis Moore with him. He said when he arrived, he saw Tucker's car and pulled up and parked. He said he saw the victim's body and saw a "head move." He then said, "Who is over there?," and a voice said, "This is Joe Thomas." Defense counsel asked, "What did Joe Thomas then do?" Bennie McGee answered, "He just bent over and run off."

Georgia McGee testified that Appellant came to her home "around midnight or after midnight." She said he had a head wound, "cuts" on his left hand, "and a big hole right in the middle of his thumb and

index finger." She also stated that "[Appellant] had shots ... in his side, some little BB's or something like that." Mrs. McGee testified that she removed "six or seven [pellets]" from Appellant's body several days later. At this point, defense introduced exhibit numbers 25, 26, 15 and 16 (photographs). Mrs. McGee identified those photographs as a true representation of the location of the pellet wounds suffered by Appellant.

## PART III

 In his first [3] point of error, Appellant claims the evidence is insufficient to support his conviction and that rational jurors could not have found beyond a reasonable doubt against him on the self-defense issue. It is the responsibility of the trier of fact to resolve conflicts in the evidence. *Jackson v. State*, 672 S.W.2d 801, 804 (1984). Even if there is evidence presented at trial suggesting innocence, the trier of fact may still find an accused person guilty. *Castro v. State*, No. 835–90, Slip op. at 3 (Tex.Cr.App. January 8, 1992).[4] The rule that states that evidence must exclude every other reasonable hypothesis than the guilt of the accused refers to the evidence that the jury relies upon to support the verdict. *Id.* In reviewing the sufficiency of the evidence, we are required to view the evidence in the light most favorable to the prosecution. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex.Cr.App. 1991). Moreover, any inconsistencies in the testimony should be resolved in favor of the verdict. *Johnson v. State*, 815 S.W.2d 707, 712 (Tex.Cr.App.1991); *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App. 1988).

 Our review shows the following facts to be undisputed: Appellant, after a fight with the victim's brother in which he sustained a severe blow to his forehead when struck by a beer bottle, went to his own home and armed himself. He said he had been apprised that the victim was armed and sought to confront him. Appel-

lant's testimony was that he then intended to walk to his father's house. Before reaching his father's house, he passed behind Atrell Hayter's house from which he heard the victim's voice. Appellant, at this point, immediately turned from his stated course and destination and proceeded directly toward the victim's voice.

Upon reaching a point in close proximity to the victim, Appellant admitted that he thereupon concealed himself in a secure place between two parked cars. He remained at this haven until, at some point, the victim began looking for his brother's truck keys. Appellant, thereafter, purposefully moved from his position of safety to an open place where he immediately shot the victim. Furthermore, the evidence is disputed as to whether the victim had raised his gun before being shot; three of the State's witnesses testified that they did not see such movement by the victim. On this record, we cannot conclude that the jury acted irrationally in finding against the Appellant on his claim of self-defense beyond a reasonable doubt. Appellant's first point of error is overruled.

 In his second point of error, Appellant argues that the trial court erred in failing to grant Appellant's requested charge concerning multiple assailants. Appellant, basing his argument upon *Brown v. State*, 651 S.W.2d 782 (Tex.Cr.App.1983) and *McCuin v. State*, 505 S.W.2d 831 (Tex. Cr.App.1974), contends that the evidence adduced at trial entitled him to a specific jury charge that he had a right to defend himself against either the victim or Joe Thomas Tucker or both.

While both *McCuin* and *Brown* pertain to the theory of multiple assailants, those cases involve factual scenarios different from the situation in the instant case. In *McCuin*, the Court of Criminal Appeals noted that three separate altercations involving members of the Lacey and McCuin families had merged into a single melee in which Robert Lacey was killed. *McCuin*, 505 S.W.2d at 831–32. The court further

---

3. So numbered in Appellant's brief on remand. In the original brief, this was Appellant's sixth point of error.

4. At the time this opinion was delivered, this Court had no knowledge of the Court of Criminal Appeals' decision to withhold the *Castro* opinion from publication.

explained that "[a]t one time or another, several Laceys were fighting with appellant and one or more other McCuins." *Id.* at 832. Based upon these facts, the trial court should have instructed the jury on Appellant's right to defend himself against all of the Laceys, any one of the Laceys, or any combination of the Laceys. *Id.*

The facts presented in *Brown* also differ materially from the facts of the instant case. In *Brown,* the court was confronted with an altercation which had initially started as a fight between Appellant and Leonard Bernard. *Brown,* 651 S.W.2d at 784. During that fight, however, Jeffry Bernard joined the fray, thus literally pitting Appellant against two assailants. *Id.* The court held that the trial court should have charged the jury on Appellant's right to defend himself against either or both of the Bernards. *Id.*

Appellant's situation differs from those presented above. During the time preceding the shooting of the victim, Appellant's only physical altercation with Tucker occurred earlier in the evening when Tucker and Hudson had intervened to stop the fight between Appellant and the victim's brother, Greg Scott. Unlike the appellants in *McCuin* and *Brown,* Appellant herein was not thrust into physical combat against numerous other combatants.

On the occasion in question, Appellant was confronted by the victim only. It was the victim's brother, not the third party Tucker, who had had an altercation with Appellant immediately preceding the shooting. Only after hearing the victim's angry statements about his desire to rectify what Appellant had done to his brother did Appellant depart from the route to his father's house to confront the victim. That Appellant was concerned only with the victim at the time of the shooting is demonstrated by the following critical testimony of Appellant in response to his attorney's direct examination:

Q: Why did you fire?

A: Because he [the victim] was coming at me with his gun. He raised his gun at me and I fired.

Q: What was in your mind? What did you think he was going to do?

A: He was going to shoot me.

We therefore conclude that the trial court committed no error in refusing to charge the jury on the theory of multiple assailants.

Moreover, had we concluded that there was error in failing to submit the multiple assailants charge, our inquiry would not end there. TEX.R.APP.P. 81(b)(2). Beyond a reasonable doubt, the failure to include this charge made no contribution to the Appellant's conviction or punishment. Although it was properly charged on self defense as to Appellant's reasonable expectation of bodily harm or death at the hands of the victim, the jury failed to find that the Appellant had acted in self defense in shooting the victim, Howard Scott. It would be unrealistic to expect that the jury would have reversed its verdict and found favorably on Appellant's plea of self defense as a result of the submission of a multiple assailant's charge with no prior confrontation by Appellant with the third party, Tucker, and no participation by Tucker in the event surrounding the actual shooting; this is directly confirmed by Appellant's quotation above in which Appellant expressed no concern for Tucker or his threats prior to his firing his gun at the victim. As the jury failed to find favorably to the self defense plea in the light of the victim's loud and threatening actions toward the Appellant, we hold that beyond a reasonable doubt the failure to charge on Appellant's self defense plea pertaining to the alleged threats by Tucker made no contribution to Appellant's conviction or to his punishment. Likewise, the elements requisite to a finding of no harm under a harmless error analysis required by *Harris v. State,* 790 S.W.2d 568 (Tex.Cr.App.1989) (en banc) were present. Appellant's second point of error is overruled.

█ In his third point of error, Appellant complains of the trial court's ruling which limited Appellant's testimony regarding his state of mind. Appellant sought to offer testimony about his apprehension of an assault by Tucker. The trial court prohibited

Appellant from mentioning Tucker's prior alleged acts of aggression.

Thereafter, Appellant perfected his Bill of Exception as to the testimony he would have offered had the court ruled it admissible. Appellant's Bill of Exception testimony pertained to Tucker's proclivity for using firearms against parties unrelated to this occurrence in situations that had transpired at various times ranging from one week to three years before the charged shooting. Appellant also testified that on one recent occasion, Tucker had threatened him because of his association with one Curtis Moore, who was not involved in the instant events.

Tucker is not the deceased and was not the intended victim. As previously stated, Appellant directly testified that the reason Howard Scott was shot was Appellant's fear that Scott, who was armed and in very close proximity to Appellant, was going to shoot him. Tucker's threat and prior use of guns had nothing to do with the shooting of the victim. The trial court committed no error in excluding this unrelated testimony. Appellant's third point of error is overruled.

Appellant's fourth and fifth points of error are directed to two comments made by the prosecutor during closing argument at the trial's punishment phase. In his fourth point of error, Appellant contends that he was entitled to a mistrial based upon the prosecutor's statement that "It's interesting to me that in this part of the hearing you did not hear the defendant call any witnesses." In his fifth point of error, Appellant contends that he was entitled to a mistrial based upon the prosecutor's comments upon the lack of remorse Appellant exhibited when he testified during the trial's guilt/innocence phase. Appellant contends that both arguments constituted comments upon his failure to testify at the trial's punishment phase and therefore require a reversal of his conviction.

■■■ A comment on an accused's failure to testify violates both the United States and Texas constitutions. *Montoya v. State,* 744 S.W.2d 15, 34 (Tex.Cr.App. 1987), *cert. denied,* 487 U.S. 1227, 108 S.Ct.

2887, 101 L.Ed.2d 921 (1988). A reversal is required only if the comment is manifestly intended or is of such character that "the jury would necessarily and naturally take it as a comment on the accused's failure to testify." *Id.* at 35. A reversal is not required where the comment can reasonably be construed as a reference to an accused's failure to produce testimony or evidence from some source other than himself. *Livingston v. State,* 739 S.W.2d 311, 338 (Tex. Cr.App.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988).

■■■ We conclude that the prosecutor's comment concerning a lack of witnesses and evidence constituted a statement about Appellant's failure to produce testimony from other sources. As such, no error was committed by the trial court in denying Appellant's motion for mistrial. Likewise, we fail to see how the prosecutor's remark about remorse in any remote way constituted a comment on Appellant's failure to testify. The comment dealt solely with Appellant's demeanor when he did testify. The trial court acted properly in denying Appellant's motion for mistrial. Appellant's fourth and fifth points of error are overruled.

Appellant's sixth point of error is directed to a comment made by the prosecutor during closing argument at the trial's guilt/innocence phase. The prosecutor argued as follows:

> I would ask you to find him guilty of the offense of murder and not let him walk out of this courtroom after leaving Mr. and Mrs. Scott without a son laying face down in the dirt for no reason whatsoever except that he was mad at his brother, something that they will have to live with the rest of their lives and something that was not justified whatsoever on the part of this defendant to leave a mother and father without a son.

Appellant objected on the basis that the argument was improper because it sought to prejudice the minds of the jurors.

■■■ To be proper, jury argument must constitute, (1) a summation of the evidence; (2) a reasonable deduction from

the evidence; (3) an answer to opposing counsel's argument; or (4) a plea for law enforcement. *McKay v. State,* 707 S.W.2d 23, 36 (Tex.Cr.App.1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986). The victim's mother testified concerning the loss of her son. On this basis, we conclude that the argument constituted both a summation of and a reasonable deduction from the evidence.

▮▮▮▮ Moreover, the record reflects that the trial court sustained Appellant's objection and instructed the jury to disregard the argument. Unless a remark is so inflammatory that an instruction to disregard cannot reasonably remove its prejudicial effects, an instruction to disregard cures any error associated with the improper argument. *Id.* at 37. We conclude that even if the argument was improper, the trial court's instruction to disregard cured the error. Appellant's sixth point of error is overruled.

The judgment of the trial court is affirmed.

COLLEY, Justice, dissenting.

Because I cannot agree under *Saxton's* standard of review that reasonable jurors could have found "against appellant on the self-defense issue beyond a reasonable doubt," I must dissent. In my opinion, this record reveals a classic case of self-defense under the court's charge which read:

> Upon the law of self defense, you are instructed that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other person's use or attempted use of unlawful force.
>
> A person is justified in using deadly force against another if he would be justified in using force against the other in the first place, as above set out, and when he reasonably believes that such force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force, and if a reasonable person in defendant's situation would not have retreated.

> By the term 'deadly force' is meant force that is intended or known by the person using it to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury.
>
> 'Serious bodily injury' means a bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ.
>
> By the term 'reasonable belief', as used herein, is meant a belief that would be held by an ordinary and prudent person in the same circumstances as the defendant.
>
> When a person is attacked with unlawful deadly force, or he reasonably believes he is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect himself from such attack or attempted attack. And it is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his life and person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the *other person's use or attempted use of unlawful deadly force.*
>
> In determining the existence of real or apparent danger, you should consider all the facts and circumstances in the case in evidence before you, together with all relevant facts and circumstances going to show the condition of the mind of the defendant at the time of the occurrence in question, and in considering such circumstances, you should place yourselves

in defendant's position at that time and view them from his standpoint alone.

Now, if you find from the evidence beyond a reasonable doubt that on the occasion in question the defendant, MICHAEL ANSARA McGEE, did kill HOWARD SCOTT by shooting him with a firearm, as alleged in the indictment, but you further find from the evidence, as viewed from the standpoint of the defendant at the time, that from the words or conduct, or both, of HOWARD SCOTT it reasonably appeared to the defendant that his life or person was in danger and there was created in his mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of HOWARD SCOTT, and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself against HOWARD SCOTT'S use or attempted use of unlawful deadly force, he shot HOWARD SCOTT with a firearm, and that a reasonable person in defendant's situation would not have retreated, then you should acquit the defendant on the grounds of self-defense; or if you have a reasonable doubt as to whether or not the defendant was acting in self-defense on said occasion and under the circumstances, then you should give the defendant the benefit of that doubt and say by your verdict not guilty of murder.

If you find from the evidence beyond a reasonable doubt that at the time and place in question the defendant did not reasonably believe that he was in danger of death or serious bodily injury, or that a reasonable person in defendant's situation, at such time and place, would have retreated before using deadly force against HOWARD SCOTT, or that defendant, under the circumstances, did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself against HOWARD SCOTT'S use or attempted use of unlawful deadly force, if any, as viewed from defendant[']s standpoint, at the time, then you must find

against the defendant on the issue of self defense.

It is true that traditionally, the authority of a jury as the trier of fact in criminal cases has been broadly defined. *See e.g., LaFoon v. State*, 543 S.W.2d 617 (Tex.Cr. App.1976). And, as the State argues, the charge in this case correctly instructs the jury that they "are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given their testimony." Moreover, the record shows that the prosecutor never asked any witness for the complete statements made by the victim, either in the yard or in the Hayter house, and none of the witnesses purport to quote the *entire* statement of the victim on those occasions. The State also argues in its brief on remand that we wrongly implied that Appellant and the victim "were in some sort of stand off or duel" though the true facts show the "victim simply looked up from the ground while ... looking for his keys and was immediately shot." The record produced by the State does not support that argument. The State further argues, without support in the record, that the victim, though enraged by Appellant's treatment of his brother, to the extent that he armed himself and began looking for the Appellant, suddenly lost all animosity towards the Appellant and started searching for the truck keys to his brother's vehicle at night with only a loaded pistol in his hand, and was thereafter murdered when he "simply looked up" at Appellant.

Additionally, the State on remand argues that the jury was entitled to believe that the "Appellant intentionally shot the victim, not in self-defense but for revenge." In support of that argument, the State notes that under the charge of the jury, that they are the exclusive judges of the credibility of the witnesses and of the weight to be given their testimony. We have no quarrel with that instruction; it is quite correct. However, the constitutional standard of review nevertheless authorizes an appellate court to determine after review of all the evidence in the light most favorable to the prosecution whether *"any*

*rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (citation omitted) (emphasis in original). In *Jackson v. Virginia,* the court also said that the foregoing standard of appellate review:

> 'gives full play to the responsibility to the trier of fact to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the fact finder's role as a weigher of the evidence is preserved through a legal conclusion that upon [appellate] review *all of the evidence* is to be considered in the light most favorable to the prosecution.' Fn. 12 (footnote omitted) (emphasis in original). The criterion thus *impinges* upon 'jury discretion only to the extent necessary to guarantee the fundamental protection of due process of law. Fn. 13' (footnote omitted) (emphasis added).

*Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789.

In the main, the State now argues that (1) the jury may disbelieve Appellant's testimony including his statement that the victim threatened to kill him, and (2) that this Court should not sit as a thirteenth juror in this case, by disregarding, realigning, or weighing the evidence. I agree. Certainly those determinations are exclusively for the jury; however, assuming, as this Court must, that the jury did in fact reject Appellant's version of the events leading up to the shooting and of the shooting itself, the State's only evidence given by at least five eye-witnesses shows without contradiction that the victim came up to the Hayter house with a loaded pistol in his hand, cursing and looking for the Appellant,[5] that the victim continued to carry that pistol in his hand while searching the yard and road for the lost keys to his brother's truck until the very time he con-

fronted the Appellant, that he was standing upright at the time of the shooting or that he raised up his body, his head, or his left hand, and saw the Appellant four to ten feet away. One State witness, Bobby Glen Scott, said that "when the victim raised up, he said something. I couldn't hear what he said." The evidence is undisputed that shortly after the shooting, the police found a loaded pistol on the ground three or four feet from the victim's body. That weapon was recovered by the police and introduced into evidence by the State. Moreover, the State's pathologist testified without contradiction that the fatal bullet entered the victim's front left chest on a trajectory perpendicular to the victim's body, and pierced the body, exiting from the victim's back. Certainly the only reasonable inferences arising from the medical testimony and the other State's testimony, is that both the shooter and the victim were both either standing up or sitting down facing one another. And since the other State's evidence shows without question that they were standing, obviously they were standing face to face, four to ten feet apart.

In a real sense, as the State observes, I do conclude from the evidence that the victim and Appellant were involved in a duel or shoot-out. Each surely came to the scene to confront the other, and when they stood face to face in their final confrontation the victim was intentionally shot. Under this record, if the roles were reversed, the victim could have rightfully claimed self-defense.

I do recognize and respect the jury's prerogative,[6] but I am also persuaded that due process of law prohibits a jury from arbitrarily disregarding the uncontradicted evidence. I must answer this question:

> Does the jury have a prerogative to disregard the uncontradicted evidence that immediately before the fatal shots were fired that the Appellant and the victim were standing face to face four to ten feet apart, each aware that the other was

---

5. All of which was known by Appellant.

6. *See LaFoon v. State,* 543 S.W.2d 617 (Tex.Cr. App.1976); *Hobson v. State,* 438 S.W.2d 571

(Tex.Cr.App.1969); *Tennison v. State,* 168 Tex. Crim. 354, 327 S.W.2d 575 (1959); *Calzada v. State,* 416 S.W.2d 429, 431 (Tex.Cr.App.1967).

carrying a deadly weapon and that the victim had just raised up his head, arm, or body still holding the pistol.

I answer that question in the negative, concluding that due process of law requires that answer. *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789 (footnote omitted). I would sustain the first point of error, reverse the conviction and order an acquittal.

I also dissent from the majority's ruling on Appellant's second point of error. This ruling ignores undisputed evidence that shortly before the fatal encounter, Appellant was informed that both the victim and Joe Thomas Tucker were armed and looking for him. Additionally, the evidence is undisputed that Tucker was present at the scene at the time of the shooting and there was conflicting evidence as to whether he was carrying a weapon.

Moreover, the rationale of the majority in support of its ruling on the second point is totally flawed. The majority holds that the "multiple assailants" charge was not required because Appellant "was not thrust into *physical* combat against others [Tucker]." (Emphasis added.) The majority also writes that Appellant was not *confronted* by Tucker. This reasoning points out that the majority has not taken cognizance of the significance of the multiple assailants charge which reads:

When a person is attacked with unlawful deadly force, or he reasonabl[y] believes he is under attack or attempted attacked with unlawful deadly force by one or more persons, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury at the hands of such assailants, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect himself from such attack or attempted attack. It is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his life and person from apparent danger as fully and to the

same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the use or attempted use of unlawful deadly force by his assailants.

You are instructed that it is your duty to consider the evidence of all relevant facts and circumstances surrounding the alleged (killing) and the previous relationship existing between the accused and the (deceased) together with all relevant facts and circumstances going to show the condition of the mind of the defendant at the time of the alleged offense. You will also consider evidence of the previous relationship, if any, existing between the accused and any other person, or persons, with the deceased at the time in question and any conduct, words, or both of such other parties with the deceased at said time. In considering all the foregoing, you should place yourselves in defendant's position and view the circumstances from his standpoint alone, at the time in question.

Now if you find from the evidence beyond a reasonable doubt that the defendant, ___, did kill ___ by (shooting him with a gun) as alleged, but your further find from the evidence, or you have a reasonable doubt thereof, that, viewed from the standpoint of the defendant at the time, from the words or conduct, or both, of deceased or other persons with him, or any of them, it reasonably appeared to the defendant that his life or person was in danger and there was created in his mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of deceased or other persons with the deceased, or any of them, and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself against ___'s use or attempted use of unlawful deadly force or against the use or attempted use of unlawful deadly force by

those persons with the deceased, he shot the said deceased, and that a reasonable person in defendant's situation would not have retreated, then you will find the defendant not guilty.

McClung, P.J., Jury Charges for Texas Criminal Practice, *Apparent Danger With Deadly Force*, Page 322 (rev. ed. 1981).

Under the record, I am persuaded that the evidence raised the multiple assailant aspects of the self-defense issue because, as the Appellant testified, he didn't see Tucker, but he knew he was there. Certainly that knowledge was sufficient to create a "reasonable apprehension of danger" from Tucker at the time of the shooting. In fact, there is evidence that Appellant was shot at the scene by someone armed with a shotgun.

Whether one considers the evidence weak, it was sufficient to require the trial court to submit the required instruction. *McCuin v. State*, 505 S.W.2d 831, 832 (Tex. Cr.App.1974). In *Brown v. State*, 651 S.W.2d 782, 784 (Tex.Cr.App.1983), the court, citing *McCuin*, wrote:

> Where the evidence [is] that the defendant was in danger of unlawful attack at the hands of more than one assailant, the court should instruct the jury that he had the right to defend himself against either or both of them.

The *Brown* court went on to say that where there are two assailants, a defendant "had a right to act in self-defense against [one of them] if he was in fear of death or serious bodily injury at the hands of either...." *Id.*

In this case, while Tucker did not physically confront Appellant at the very time of the shooting, his presence considered along with the evidence that he was armed and looking for the Appellant, certainly, from the Appellant's point of view at least, was more than sufficient to produce a fear in the mind of Appellant. I would sustain the second point of error, and on that basis alone reverse and remand the cause for a new trial.

## OPINION ON APPELLANT'S MOTION FOR REHEARING

Appellant's Motion for Rehearing has called to our attention two instances in the court's opinion wherein it is claimed that the evidence was misstated.

First, Appellant complains that the opinion incorrectly recited that after an earlier altercation with the victim's brother, Appellant "went to his home and armed himself." Specifically, the claimed inconsistency relates to Appellant's own testimony that while he was proceeding directly to his home prior to the shooting, he stopped in the road to rest and was there advised by some children that the victim and Joe Thomas Tucker were armed and looking for him. At this point, Appellant's brother, Paul, was present and gave the Appellant his rifle. Thus, the sole distinction urged relates to whether Appellant armed himself at home or while en route to his home.

Regardless of the place where the rifle came into his possession, Appellant thereafter advanced from his concealed position of safety near Atrell Hayter's house to shoot the victim. Despite the opinion's minor factual variation, we conclude that the jury did not act irrationally in finding that, beyond a reasonable doubt, Appellant did not shoot the victim in self-defense. Appellant's first ground for review is overruled.

Appellant, secondly, directs us to the section of the opinion wherein it is stated that Appellant's only prior altercation with Tucker had occurred earlier in the evening of the shooting; the opinion however recited that Appellant's only previous *"physical altercation"* with Tucker had, in fact, occurred earlier on the evening of the shooting when Tucker and another bystander had intervened to stop the Appellant's fracas with the victim's brother. Thus, this statement in the opinion was not inaccurate. Appellant argues that he had testified that during the preceding week Tucker had threatened to kill him. Tucker denied having made this threat.

Furthermore, the record shows that immediately before the shooting only the victim, not Tucker, uttered the cursing threats pertaining to the Appellant, some of which

threats were heard by the Appellant; these remarks apparently motivated Appellant to deviate from his intended route and proceed toward the sound of the victim's voice.

Appellant's own testimony bears directly upon the court's failure to give the requested charge. As recited in the opinion, Appellant acknowledged that his sole motive for shooting the victim was his belief that the *victim* wrs going to shoot him. Conversely, there was no mention in Appellant's testimony of Tucker's earlier threat, if any, as having affected his mental decision to shoot the victim. We hold that there was no error in the court's failure to give the multiple assailants charge. We overrule Appellant's second ground for rehearing.

Appellant's Motion for Rehearing is denied.