**Levy Lee EDMONDSON, Jr., Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 11–95–00342–CR.**

Court of Appeals of Texas,
Eastland.

July 2, 1998.

Paul K. Williams, Williams & Kirk, Midland, for appellant.

David Van Brunt Price, Charles Cobb, Asst. Atty. Gen., Austin, Hardy Wilkerson, Dist. Atty., Big Spring, for appellee.

Before ARNOT, C.J., and DICKENSON and WRIGHT, JJ.

## OPINION

ARNOT, Chief Justice.

The jury convicted Levy Lee Edmondson, Jr. of the capital murder [1] of Texas Department of Public Safety Trooper Troy M. Hogue and assessed his punishment at confinement for life. [2] We affirm.

In his first point of error, appellant challenges the legal and factual sufficiency of the evidence. Specifically, appellant contends that the evidence presented by the State's witnesses established that the gun seized as the murder weapon could not have been fired in the configuration in which it was seized from appellant and that the bullets in the gun could not have caused the wound to Trooper Hogue's head. In the second point,

appellant contends that the trial court erred in refusing to charge the jury on the lesser included offenses of manslaughter and criminally negligent homicide.

In order to determine if the evidence is legally sufficient, we must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Clewis v. State*, 922 S.W.2d 126 (Tex.Cr.App.1996); *Geesa v. State*, 820 S.W.2d 154 (Tex.Cr.App. 1991). In deciding whether the evidence is factually sufficient to support the conviction, we review all of the evidence to determine if the verdict is so against the great weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, supra.

Jonathan Albert Simpson testified that appellant came to his house in Sand Springs about 3:30 p.m. on December 30, 1994. Simpson had known appellant since they had been in the sixth grade. The two juveniles got into appellant's car and drove around "like [they] always did." One of the first things appellant did was show Simpson his gun. The gun was an antique Webley pistol. Appellant kept the gun on the floorboard. Simpson testified that appellant was sober when he picked up Simpson and that appellant was drinking MD 20/20 wine. Appellant told Simpson that he had stolen the wine from a 7–Eleven store. Simpson drank some "to see what it tasted like."

Simpson testified that they drove and talked from the time they left Simpson's house until around 8:00 p.m. when appellant drove Simpson home. During this time, they went to the mall twice, to Radio Shack, to a 7–Eleven, to shoot appellant's gun, and to Francisco "Frank" Cervantes' house. Simpson said that, whenever they went into the mall or the 7–Eleven, appellant would put the gun inside his boot. Simpson said that they went by Frank's house about 4:00 or 4:30 p.m. Appellant showed Frank both the

---

1. TEX. PENAL CODE ANN. § 19.02 (Vernon 1994) defines the offense.

2. TEX. PENAL CODE ANN. § 12.31 (Vernon 1994) provides that a person convicted of capital murder shall either be confined for life or sentenced to death.

gun and the wine. Simpson could not hear everything that appellant and Frank said.

After that, they went to a 7–Eleven where appellant stole some more wine. They continued to drive around. Appellant parked the car, and they shot the gun from the car. Simpson fired the gun once, and appellant fired the gun two or three times. The gun "shot hard," and appellant told Simpson to use both hands when he shot. Simpson saw appellant reload the gun by breaking the gun open. Appellant took out the empty shells and placed new bullets in the gun. Simpson stated that the cylinder of the gun was full before they fired it and that appellant "completely" reloaded the gun with bullets from the glove compartment of appellant's car. Simpson stated that appellant was "pretty much done" with the first bottle of wine by the time they fired the gun.

They went back to the mall and to Radio Shack. Simpson said that appellant was "pretty much drunk by then." Appellant was "swerving all over the road and talking all kinds of stuff." He was driving between 20 and 25 miles per hour down the service road of the highway. Simpson asked to drive "several times." Appellant "would straighten up" when Simpson reminded him that he was weaving, but appellant would not increase his speed. Simpson stated that he finally "got fed up" and told appellant to take him home. Appellant got onto the highway, increased his speed to about 45 miles per hour, and took Simpson home. Simpson stated that appellant dropped him off at 5 or 10 minutes before 8:00 p.m.

Frank Cervantes testified that appellant was driving a gray four-door car when he came to Frank's house. Frank thought appellant came by about 7:00 or 7:30 p.m. However, Frank also stated that it could have been earlier in the evening. Frank could not tell if anyone was in the car with appellant. Frank's brother, Roy Cervantes, talked with appellant first. Roy then came into the house and told Frank that appellant wanted to talk to him. When appellant first asked Frank to go with him, Frank told appellant, "No." Frank testified that appellant was "chugging" a bottle of Thunderbird wine. Appellant then asked Frank if Frank wanted

to "go do some heroin or some PCP." Frank told appellant that "[he didn't] do that." Appellant asked Frank if he smoked "weed," and Frank answered that he did. Appellant responded by stating, "Oh, all right" and "Let's go to Coahoma and shoot somebody." When Frank said that appellant probably did not even have a gun, appellant put his gun "right there in his lap." Frank wanted to know who they would shoot. Appellant said, "Anybody we see." Frank did not go with appellant.

Kenneth Francis Young testified that, while he was driving east on Interstate 20, he saw a car in his rearview mirror as he approached Coahoma. The car was coming toward him at a "high rate of speed." Young was concerned that the car would rear-end his vehicle. Young slowed down, and the car passed him on the shoulder. The car exited, and Young saw sparks come from underneath the car when it hit something. Another vehicle had to swerve to keep from being hit by the car. The car came up the embankment from the service road onto the highway. Young "floored" his vehicle to avoid being hit. The car stopped when it became "hung up on the guardrail."

Frank Burton Morphis was working at his video store located on the Interstate 20 service road in Sand Springs. Morphis had gone outside to service the Coke machine when he heard a noise. He turned and saw a vehicle going down a deep drainage ditch. The light-colored car went slowly up the embankment and "hung" on the guardrail. The car appeared to be "halfway or so" over the guardrail. Morphis saw some sparks come from underneath the car. It appeared to him that the driver was accelerating in an effort to get off of the guardrail. Morphis went back inside his store to wait on a customer. He saw the flashing lights of a law enforcement vehicle. From inside his store, Morphis heard two distinct bangs.

Ryan Keith Trent was traveling on Interstate 20 with his wife, their daughter, his wife's cousin, and the cousin's girlfriend. Trent saw "taillights come over" the guardrail. When they realized that a car was hung on the guardrail, Wesley Boren (Trent's wife's cousin) stopped. Appellant stepped

out of the car. Appellant told Trent and Boren that he was drunk, said that he was not hurt, and asked if they could help him get his car off of the guardrail. Boren left to use the phone. Appellant told Trent that he must have fallen asleep and asked several times if Trent could give him a ride home. Three "young kids" walked over and asked appellant if he was all right. Appellant seemed nervous and scared. Appellant walked over to his car twice. He first turned on his hazzard lights and put on a jacket and a hat. He then returned to turn off the hazzard lights when someone had noticed fluid leaking from his car. A marked Howard County Sheriff's Department patrol car drove up. The deputy parked near appellant's car. Appellant "sort of crouched down" behind the three young men. When the deputy asked who the driver of the car was, the group of people standing at the scene pointed to appellant. Appellant was still standing behind the three young men at this time. The three young men would "ease away from" appellant, and he would move to try to blend in with them. This happened several times. The deputy took Trent's name and the names of the people with him and told them that he would contact them if necessary.

Scott Goodblanket and Jeremy James White testified that they saw the accident. When they saw the car on the guardrail, Goodblanket parked his vehicle. Goodblanket, White, and Matt Fontana walked to the scene of the accident. Goodblanket testified that there was a "bunch of people" standing near the car and that appellant was standing by himself. The boys recognized appellant from school. Appellant indicated that he recognized Goodblanket, White, and Fontana. Appellant told the three that he had fallen asleep and that he had awakened on "his way up" the embankment. Goodblanket and White testified that they could smell alcohol on appellant and that he was drunk. Appellant told them that he had not been drinking. Two or three times, appellant asked them if he should leave the scene and told them that he would "be in trouble if the cops came." The boys told him to stay. Appellant asked them "to stick up for him" and to be witnesses. Appellant told them that he was

going to tell the police that he swerved to avoid a cat. First, a deputy sheriff arrived on the scene, and then a Department of Public Safety (DPS) vehicle came. Goodblanket saw two troopers get out and walk over to the deputy sheriff's vehicle. Both Goodblanket and White testified that they heard two gunshots. White testified that, after the gunshots, he saw a struggle. Before the gunshots, the boys had not heard any yelling or seen any signs of a struggle.

While he was working as a dispatch officer, Howard County Deputy Sheriff Clifford Raymond McCartney took the original "911" call about an accident. Deputy McCartney stated that he tried to reach Trooper Hogue because DPS officers usually handled accident calls. Trooper Hogue was "checked out for supper," and Deputy McCartney's supervisor instructed him to go to the scene. Deputy McCartney arrived at the scene at 8:18 p.m. He saw a gray four-door car up on the guardrail and at least five people standing around. The bystanders identified appellant as the driver; and appellant said, "Here I am." Appellant told Deputy McCartney that he was fine and that no one was with him.

Appellant gave Deputy McCartney his driver's license and followed Deputy McCartney to the patrol car. Appellant appeared to have no trouble understanding Deputy McCartney and did not stumble or fall. There was a lot of traffic that night. Deputy McCartney testified that he had appellant follow him to the patrol car for appellant's safety and security. Deputy McCartney further stated that, while he appeared to be intoxicated, appellant did not appear to be dangerous or to be a threat and that there was no indication that appellant might have a weapon. Both Deputy McCartney and appellant got into the front seat of the patrol car.

When Deputy McCartney first asked him if he had been drinking, appellant said, "No." After Deputy McCartney stated that he could smell alcohol, appellant admitted that he "had drunk a little." Appellant began to tell Deputy McCartney that a cat had run across the interstate and that he had swerved to miss the cat. Deputy McCartney

told appellant not to tell him but to tell the troopers when they arrived. As Deputy McCartney attempted to radio Trooper Hogue to advise him that appellant appeared intoxicated, Trooper Hogue and his partner arrived on the scene.

Deputy McCartney told appellant to stay in the patrol car, and Deputy McCartney got out to talk to the troopers. Deputy McCartney went over to the troopers' car and gave Trooper Hogue appellant's driver's license. The two officers then went back to the patrol car where Deputy McCartney opened the front passenger door. Deputy McCartney stepped back, and appellant got out of the car. Appellant was face to face with Trooper Hogue. Trooper Hogue asked appellant if he was alone. Appellant did not answer right away. He rolled his eyes and then said that no one was with him. Twice appellant denied that he was drunk.

When Trooper Hogue asked what had happened, appellant began to tell the same story about a cat running out in front of him. Deputy McCartney testified that, as appellant talked to Trooper Hogue, appellant pointed with his left hand. Deputy McCartney turned to look where appellant was pointing and heard one gunshot followed immediately by another gunshot. Deputy McCartney was not sure if the second sound he heard was a gunshot or an echo of the first gunshot. Appellant was still talking when Deputy McCartney heard the first shot. There was no struggle or scuffle. When he turned back around, Deputy McCartney saw a gun in appellant's right hand and saw Trooper Hogue falling.

Deputy McCartney jumped on top of appellant, and they fell to the ground. Appellant had both hands on the gun and was turning it toward Deputy McCartney. Deputy McCartney testified that he was able to get his hands on top of appellant's hands but was not able to get his hands on the gun. Trooper Darryle Duane Sparks joined the struggle and was able to get his hands on the gun. Despite repeated demands, appellant would not let go of the gun. Deputy McCartney stated that appellant held on to the gun until Deputy McCartney hit appellant with his elbow as hard as he could in the side of the head. Then, appellant let go of the gun. After Trooper Sparks recovered the gun, appellant told Deputy McCartney that he would not fight.

Deputy McCartney rolled appellant over on to his stomach and handcuffed him. When he took appellant around the patrol car, Deputy McCartney saw Trooper Hogue's body. Deputy McCartney asked appellant if he knew what he had done. Appellant responded, "Yes, sir. I don't know why I did it."

Trooper Sparks testified that he got a call about a wreck on Interstate 20 about 8:15 p.m. He picked up Trooper Hogue from Trooper Hogue's home, and they went to the accident scene. They arrived about 8:30 p.m. and parked behind the sheriff's department patrol car. Trooper Hogue went to the front of their car to meet Deputy McCartney. Trooper Sparks went around the rear of the vehicle to get out of the traffic. He joined Trooper Hogue and Deputy McCartney by the passenger door of Deputy McCartney's patrol car. The door was open, and Trooper Hogue was beginning to question appellant. When Trooper Hogue asked if appellant had been drinking, appellant denied it. When Trooper Hogue asked appellant if anybody was with him, appellant looked away.

Trooper Hogue then handed Trooper Sparks appellant's driver's license, and Trooper Sparks turned to prepare an accident report. The CB antenna was in his way, and Trooper Sparks stepped back and placed his clipboard on the trunk. As he was separating two report forms, Trooper Sparks heard a gunshot. He took cover and came up with his pistol drawn. Trooper Sparks saw Trooper Hogue's body lying on the ground. Blood was coming from Trooper Hogue's head, and Deputy McCartney was struggling with appellant.

After radioing the Howard County Sheriff's Department and the Midland Department of Public Safety, Trooper Sparks went to help Deputy McCartney. Appellant had both of his hands on the gun, and Deputy McCartney had his hands around appellant's wrists. Trooper Sparks was able to grab the gun around the cylinder and the hammer in a

way that his left thumb was over the hammer area to prevent the gun from discharging. Appellant did not release the gun until Deputy McCartney struck him in the head. Trooper Sparks then removed the gun.

On his way to secure the gun, Trooper Sparks stopped by Trooper Hogue's body, leaned down, unsnapped the hammer guard, and removed Trooper Hogue's gun from his holster. Trooper Sparks testified that he removed Trooper Hogue's gun to secure the area so that there would be "no weapons, loose weapons laying around."

Kelly Lynn Overton, a paramedic, testified that she was at home when she heard "commotion" on the scanner. She went to the scene to see if she could help. When she arrived, she heard gunfire and stayed back. She "hollered across and asked if anybody needed help." One of the officers asked her to approach. She found Trooper Hogue lying on his left side beside the guardrail. There was no movement, no pulse, and no respiration. Approximately a liter of blood was on the ground. There was brain matter on his forehead. Blood and spinal fluid was flowing out of his right ear and out of the entrance and exit wounds in his head. Overton testified that Trooper Hogue was "obviously dead." She covered Trooper Hogue's body with a highway blanket.

Texas Ranger Frank Malinak arrived at the scene at 9:35 p.m. A DPS mobile crime laboratory also came to the scene. Ranger Malinak testified that, when the .455 Webley recovered from appellant was opened for the first time, the cylinder was full. Two of the six bullets in the cylinder had been fired. The cylinder turned clockwise, and the fired bullets were in the 11:00 and 12:00 positions. Ranger Malinak stated that the gun was an old weapon from the early 1900s. The cylinder rotated freely. Ranger Malinak stated that the reason the fired bullets were "out of line" was that the cylinder had turned during the struggle.

Appellant was taken to the Howard County Jail. Four live .45 caliber bullets were found in appellant's right front pants pocket. Appellant's blood was drawn at 12:22 a.m. At that time, appellant's blood alcohol content was .11. No drugs were detected in the blood sample.

David Walker Spence, a DPS forensic chemist, examined Trooper Hogue's hat and appellant's clothing. The two bullet holes in the hat were consistent with a gun being fired from a distance of 18 inches or less from the hat's brim. After examining appellant's clothing, Spence found lead residue in the front pocket of his jeans, in an inside pocket of his leather jacket, and inside his left boot. Spence testified that this residue was consistent with a fired weapon or bullets coming in contact with the clothing.

Department of Public Safety Firearms and Tool Mark Examiner William M. Sorrow testified that the Webley fired .45 caliber bullets. When fired, the spent bullets would move clockwise to the right. Sorrow also testified that the cylinder of the Webley moved "freely."

Lubbock County Chief Medical Examiner Jerry Douglas Spencer conducted the autopsy. Dr. Spencer stated that the bullet entered above the left eyebrow and exited on the right side of the back of the head. While the entrance wound in the skin measured 5/16 of an inch, the entrance wound in the skull measured 9/16 of an inch. Dr. Spencer testified that the reason the size of the wound was smaller in the skin was that skin was elastic and would stretch, whereas bone would not. Dr. Spencer stated that the wound was consistent with a .45 caliber bullet being fired at close range. The angle of the wound was consistent not only with someone bending down to grab a gun but also with someone bending his head "[l]ike a flinch." Dr. Spencer further explained that his autopsy report contained a transcription mistake when it stated that the size of the entrance wound in the bone was 5/16 of an inch. Dr. Spencer stated that the correct size was 9/16 of an inch, and the State introduced photographs to support his testimony.

The record also reflects that, 15 days before the shooting, appellant had been placed on juvenile probation for aggravated robbery and felony escape. The State introduced testimony from three men who had been incarcerated with appellant at various times in the Howard County Jail. James Lawrence

Eastham testified that appellant told him that he shot Trooper Hogue because the trooper "always" was "a smartass," "was always harassing" appellant, and "messed with him all the time." Eastham further testified that appellant said that he told the trooper to draw. When the trooper laughed, appellant said, "I'm for real. Draw." After he shot the trooper, appellant said that the trooper started "shaking like a chicken" and that "his brains were purple." Appellant also told Eastham that, if he had been sober, he could have shot the other officers. Sammy Ferrell testified that appellant told him that the trooper "got smart with him." Appellant told the trooper to draw, and the trooper laughed. Appellant then shot the trooper. Appellant told Ferrell that the "officer was flopping around." Reynaldo Sanchez stated that appellant told him that the trooper's body was "flopping like a chicken with his neck broke."

Appellant testified that he had been drinking from a bottle of whiskey before he picked up Simpson. He also drank from two bottles of MD 20/20. Appellant testified that he only talked to Roy Cervantes; that he never talked to Frank Cervantes; and that he never said, "Let's go to Coahoma and shoot some people." Appellant did not remember firing the pistol with Simpson; he did not remember where he let Simpson out; he did not remember going up the embankment or onto the guardrail; and he did not remember his conversation with the two highway patrolmen. Appellant remembered keeping his gun in the car trunk; he remembered that he did not take the gun into the mall; he remembered that Simpson got out of the car; he remembered that he could not keep his hands on the steering wheel and that he fell to the floorboard of his car; and he remembered straddling the hump of the floorboard on his stomach. Appellant also remembered waking up on the floorboard of his car; he remembered Fontana, Goodblanket, and White being at the scene; he thought he remembered telling them something about a cat; he remembered talking to Deputy McCartney; and he remembered being alone in Deputy McCartney's vehicle and falling asleep. Appellant remembered that he did not recognize the highway patrolmen; he

remembered that he ignored the highway patrolmen and that he "just . . . wanted to go to sleep"; he remembered a loud pop; he remembered falling to the ground; he remembered being in the backseat of a law enforcement vehicle; and he remembered waking up in jail. Appellant stated that he shoots left-handed and that he did not have the gun in his hand when he got out of the car or during the struggle. Appellant also testified that he doubted that he gestured to the officers because that was "stupid." Appellant further testified that there was "[n]ot a question" in his mind that he did not shoot Trooper Hogue and that it was not possible that the shooting was an accident.

Dr. Wilton N. Jones, M.D., testified that appellant's blood alcohol level at the time of the shooting could have been anywhere from .19 to .25. Dr. Jones stated that, at the .19 level, it was possible for an alcoholic blackout to occur, during which a person would know what he was doing but would have no memory of the activity.

■ The jury, as the trier of fact, is the sole judge of the weight and credibility of witnesses' testimony. TEX. CODE CRIM. PRO. ANN. arts. 36.13 & 38.04 (Vernon 1979 & 1981); *Barnes v. State*, 876 S.W.2d 316 (Tex.Cr.App.), *cert. den'd*, 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994); *Lafoon v. State*, 543 S.W.2d 617 (Tex.Cr.App.1976). The record reflects that the cylinder of the Webley rotated freely and that the size of the entrance wound in the skull was consistent with the size of the bullets in the Webley. A rational finder of fact could have concluded that the spent bullets were in the 11:00 and 12:00 positions because the cylinder rotated during the struggle for the gun and that there was a transcription error in the autopsy report. The evidence is legally sufficient. In determining the factual sufficiency of the evidence, we review the fact finder's weighing of the evidence and cannot substitute our judgment for that of the fact finder. *Clewis v. State*, supra. After reviewing all of the evidence, we hold that the jury's verdict is not so against the great weight of the evidence as to be clearly wrong and unjust. The evidence is factually sufficient. The first point is overruled.

■ Appellant contends that, based on Dr. Spencer's testimony that the trajectory of the bullet through Trooper Hogue's head was consistent with Trooper Hogue bending over and grabbing the gun, the trial court should have charged the jury on the lesser included offenses of manslaughter[3] and criminally negligent homicide.[4] Appellant's position at trial was that he was intoxicated at the time; that, as a result of his intoxication, he was unable to recall some of his activities and some of the events of the evening; and that no one saw the actual shooting.[5] However, while he did not remember many of the events of December 30, 1994, and denied having the Webley in his hand, appellant testified unequivocally that he did not shoot Trooper Hogue and that the shooting was not an accident. No evidence was presented which negated the requisite intent of intentional and knowing for the offense of capital murder or which indicated an intent of recklessness or criminal negligence as germane to the alleged lesser included offenses; therefore, the requested instructions were not required. *Skinner v. State*, 956 S.W.2d 532 (Tex.Cr.App.1997); *Wolfe v. State*, 917 S.W.2d 270 (Tex.Cr.App.1996). Appellant has not established that the trial court erred in failing to instruct the jury on manslaughter or criminally negligent homicide. *Rousseau v. State*, 855 S.W.2d 666 (Tex.Cr.App.), *cert. den'd*, 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993); *Royster v. State*, 622 S.W.2d 442 (Tex.Cr.App.1981). The second point is overruled.

The judgment of the trial court is affirmed.

---

**3.** TEX. PENAL CODE ANN. § 19.04 (Vernon 1994) provides that the requisite mental state for the offense of manslaughter is recklessness.

**4.** TEX. PENAL CODE ANN. § 19.05 (Vernon 1994) states that a person commits an offense "if he causes the death of an individual by criminal negligence."

**5.** TEX. PENAL CODE ANN. § 8.04 (Vernon 1994) states that voluntary intoxication is not a defense to the commission of an offense.