Affirmed and Memorandum Opinion filed September 25, 2007








Affirmed and Memorandum Opinion filed September 25, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-00132-CR

____________

 

JONATHAN MAURICE WILLIAMS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 228th
District Court

Harris County, Texas

Trial Court Cause No. 990,259

 



 

M E M O R A N D U M   O P I N I O N

A jury found appellant, Jonathan Maurice Williams, guilty
of aggravated robbery.   The same jury assessed punishment at 23 years= confinement and a
$600 fine.  On appeal, appellant complains about the sufficiency of the
evidence, ineffectiveness of counsel, and trial court error regarding jury
instructions and failure to grant a mistrial.  We affirm.  

Factual
Background








On October 12, 2003, Lucas Jimenez was at home with his
daughter, son-in-law, and their baby boy, Carlitos.  Jimenez heard a knock at
the door, and went to open it, suspecting that his roommate had forgotten his
key and had returned from doing laundry.  When he opened the door, two black
males pushed the door open and forced their way inside.  One of them had a gun,
which he pointed at Jimenez.  The two men forced Jimenez into the bedroom,
where his daughter, Antoinetta Marcos, and her husband Candelario Hernandez
were looking after their baby.  The men forced the family to lay down on the
floor, leaving the baby where he had been in the middle of the bed, and the man
later identified as appellant held the family at gunpoint while his accomplice
ransacked the apartment.  

At some point during the robbery, Jimenez=s roommate,
Benigno, did in fact return from doing his laundry.  The two men grabbed him
when he came in and put him on the floor in the bedroom with the rest of the
family.  The men then covered all four adults with a blanket, so they could not
see what was happening.  The family remained under the blanket, not moving,
until they did not hear the men in the apartment anymore.  Estimates of the
amount of time spent under the blanket range from ten to forty minutes. 

The family got up and surveyed the damage.  The apartment
had been ransacked, and cash, jewelry, including Marcos=s wedding ring,
and a video cassette recorder were stolen from the apartment.  At this point,
the family called the police to report the incident.  The police arrived
shortly thereafter, filled out a report, and gave Jimenez a card with a number
to call in case he ever saw the robbers again.  








After the police left, Jimenez, having no money with which
to buy food, went to a cousin who lived nearby and borrowed $100 to feed his
family.  Jimenez, his son Alvarro, and Benigno took the $100 and went to the
grocery store to buy food.  On the way home from shopping, Jimenez spotted the
two robbers standing in front of a gas station.  Jimenez instructed Alvarro to
get out and call the police from a pay phone.  When the police arrived, they
talked to Jimenez, and he pointed out the two men to the police.  The police
approached the men with weapons drawn, and appellant grabbed the pocket of his
pants, and ran.  Both officers gave chase, and pursued appellant into the
parking lot of a nearby apartment complex.  After calling for backup, officers
eventually found appellant hiding under a vehicle.  He had ninety dollars in
his possession, but no gun or loot from Jimenez=s apartment.  

The officers brought appellant back to their squad car, and
after putting him in the back, had Jimenez, Benigno, and Hernandez separately
approach the car and look at appellant to see if they would confirm that he was
one of the men who had robbed them.  The men confirmed that appellant was one
of the robbers.  

The single contested issue at trial was the identity of the
robber.  The State began its case by calling Jimenez, Hernandez, and Marcos to
the stand to testify to the events of the robbery, and to identify appellant as
one of the robbers.  Jimenez took the stand first, and testified that he
recognized appellant as one of the men who had entered his apartment. On
cross-examination, Jimenez recounted the description he had given the police,
which included black t-shirt, long black shorts, and a black rag on his head.  He
described the robber as being of average height, with somewhat dark skin, and
having a silver tooth.  He testified that when he saw the men at the
convenience store that evening, they were wearing the same clothes they had
worn during the robbery.  

Jimenez testified on cross-examination that the blanket was
thrown over the family as soon as they were taken to the bedroom, but on
re-direct, he clarified that the blanket obscuring the group=s view of the
robbers was only thrown over them after Benigno came home and was brought into
the bedroom.  On cross-examination, when defense counsel asked him whether he
got a good look at appellant=s arms, Jimenez said Ayes.@  Jimenez stated
he did not notice any tattoos on appellant=s arms.  On
re-direct, he testified that he was the first person to see the robbers, and
was the closest person in the apartment to the appellant, and that he Ajust saw
[appellant=s] face,@ rather than his
arms or body.  








Hernandez gave a similar description of the events in the
apartment, and also made an in-court identification of appellant as being one
of the robbers.  He testified to being in the doorway to the bedroomCsome 20 feet from
the front door when the men forced their way in, and that from this vantage
point he was able to see their faces as they came in.  They came forward until
they were about two feet from Hernandez, at which point he could see their
faces clearly.  He also testified to making an identification of appellant in
the officers= patrol car, and that he was certain of his
identification.  On cross-examination, Hernandez admitted that he only saw the
gunman=s face for a brief
time.  He also testified on cross-examination that he saw both of appellant=s forearms.  He
did not notice any tattoos on appellant=s arms.  

Marcos gave a similar version of events, and also made an
in-court identification of the appellant.  She testified on direct that Officer
Mejia asked her to view a video lineup, but she refused because she was scared
to watch it alone.  On cross-examination, Marcos testified that she had not
viewed a video lineup, but had viewed one in person, where she identified
appellant.  She later testified that she never saw any lineup.  Marcos=s testimony was
clearly plagued by communication difficulties.[1]

The defense put on evidence to countervail the State=s identification
witnesses.  The first was Officer Mejia, who testified that after appellant had
been arrested, Officer Mejia created a mock lineup and videotaped it.  He then
showed the mock lineup to Marcos at her apartment the day after the incident. 
He testified that she viewed the entire tape but could not make a positive
identification.  On cross examination, he testified that Marcos was adamant
that she did not want to view the tape because she was afraid for her life. 
She also thought that she did not need to view the tape since her father had
made an identification, but that she acquiesced and viewed it at Officer Mejia=s suggestion.  He
also testified on cross-examination that individuals are often able to identify
someone in person that they may or may not be able to identify from photos or a
video.  








Finally, appellant himself testified.  He testified that he
had a temporary job at the time of the robbery.  He said he had been home all
day that Sunday until 6:00 or 6:30 p.m., at which time he and two friends went
to Ahang out@ in the parking
lot of a store.  Also, he testified to buying marijuana from a black male he
had seen around before, while at the convenience store.  He testified that he
ran from police because he thought they were going to arrest him for drug
possession.  He said that, when he ran from the police, he threw the marijuana
he had purchased into some bushes, which explained why he did not have any
drugs on his person when he was searched pursuant to arrest.   Appellant stated
that the tattoo he now has on his neck has been added since he has been in
jail, but that all of the tattoos on his arms were there at the time of the
robbery.  

On cross-examination, appellant admitted that he has, and
had at the time of the robbery, Agold upper and
lower teeth.@  He also admitted that since his incarceration, he
has been caught twice with tattooing paraphernalia in his jail cell.  

Analysis

Appellant raises four issues on appeal:  1) the trial court
erred in not granting a mistrial when prosecutor commented on appellant=s failure to
testify at punishment phase; 2) the evidence is factually insufficient to
support the jury=s finding that appellant was the
perpetrator of the offense; 3) the trial court committed fundamental error in
failing to instruct the jury at guilt/innocence on the issue of eyewitness
identification; and 4) appellant=s counsel was
ineffective for failing to re-offer appellant=s videotaped
statement as impeachment evidence.  Because issues two through four would
require remand for a new trial on guilt/innocence, we examine these issues
first. 

I.        Evidence
is Factually Sufficient

In his second issue, appellant complains about the factual
insufficiency of the evidence as to his identification.

A.      Standard
of Review








A factual sufficiency review begins with an assumption that
the evidence is legally sufficient.  Santellan v. State, 939 S.W.2d 155,
164 (Tex. Crim. App. 1997).  In performing our review, we view all the evidence
without the prism of Ain the light most favorable to the
prosecution,@ and we set aside the verdict only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.  Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  

The jury is the judge of the facts, and the exclusive judge
of the credibility of witnesses.  Id at 407, 408B09.  The weight to
give contradictory testimonial evidence is within the sole province of the jury
since the determination turns on an evaluation of credibility and demeanor.  Id.
at 408B09.  We exercise our fact jurisdiction only to prevent
a manifestly unjust result, not to impose a result we feel is more reasonable. 
See Clewis v. State, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996).  We
review all of the evidence in the record, and view it as a whole.  Cain,
958 S.W.2d at 408.  If we find the evidence factually insufficient, we must
support that finding by a detailed explanation, in order to ensure we maintain
proper deference to the jury.  Id. at 407.   

B.      Jury=s Finding Not
Manifestly Unjust

In his argument of factual insufficiency, appellant points
to several pieces of evidence that he suggests militate toward a finding of
insufficiency.  First, he points out that this was a close case, as the first
trial ended in a mistrial due to jury deadlock.  While this fact is evident in
the appellate record, it was not before the jury, and therefore it may not be
considered in the factual sufficiency review.  See Cain, 958 S.W.2d at
407B08.  








Next, appellant points out several facts that he claims
would undermine the identifications by Jimenez, Hernandez, and Marcos.  He
points out that both Jimenez and Hernandez said that they each saw appellant=s face only
briefly before being forced to look away.  He also stresses that Jimenez and
Hernandez said they each had the opportunity to see the assailant=s arms but did not
notice any tattoos on them.  He points out that, despite making an in-court
identification, Marcos gave conflicting testimony about whether she ever viewed
a lineup, and whether she was able to identify appellant in the lineup.  To the
extent she testified that she did not see a lineup, this testimony conflicts
with Officer Mejia=s testimony that he showed a video lineup
to Marcos, and that she was unable to identify anyone.  Appellant also points
out that the lineup was recorded while he had on the same clothes in which he
was arrested.  Finally, appellant points out that he testified that he did not
commit the offense, that he had tattoos on his arms at the time of the offense,
and he gave the jury both an alibi and a reason for his flight from police. 

Each of these facts goes to the credibility of the
eye-witness testimony, which is the province of the jury.  Id. at 408B09.  The jury was
free to believe the in-court and out-of-court identifications, even though the
witnesses looked at appellant=s face for only a short time.  Seeing the
tattoos in the courtroom, the jury could reasonably have concluded the tattoos
were close in color to the color of appellant=s skin, and
therefore, that it was not remarkable, under the circumstances, that the
witnesses did not notice or remember them.  See id.  The jury was also
free to resolve Marcos=s conflicting testimony against appellant,
and to disbelieve appellant=s explanations for the evening=s events.  See
id. at 410 (holding that where evidence is subject to two equally
reasonable interpretations, a decision is not manifestly unjust because the
jury resolves the decision in favor of the State).  Having reviewed the entire
record, we hold that the jury=s determination was not contrary to the
overwhelming weight of the evidence.  We overrule appellant=s second issue. 

II.       No
Fundamental Error in Failing to Instruct Jury on Eyewitness Identification

In his third issue, appellant complains that the trial
court committed fundamental error in failing to instruct the jury on the issue
of eyewitness identification with a charge that substantially tracks pattern
jury instruction 1.29 of the Fifth Circuit=s pattern jury
instructions.  The review of alleged jury charge error is a two step process.  See
Almanza v. State, 686 S.W.2d 157, 174 (Tex. Crim. App. 1984).  First, we
examine the court=s charge to see if the court erred, then
we determine if there is sufficient harm to warrant reversal.  Id. 








In this case, we hold that the trial court did not err. 
The Court of Criminal Appeals has held that a charge instructing the jury of
its duty to acquit if it had a reasonable doubt that the defendant was
mistakenly identified is an improper comment on the weight of the evidence, and
should not be given.  Laws v. State, 549 S.W.2d 738, 740 (Tex. Crim.
App. 1977).  Following Laws, we hold that such an instruction is not
permitted, and therefore the trial court did not commit error in refusing to
give it.  See St. Luce v. State, No. 14-98-01316-CR, 2000 WL 1862843, at
*1 (Tex. App.CHouston [14th Dist.] Dec. 21, 2000, pet. ref=d) (holding that
the same instruction requested in this case would have been an impermissible
comment on the evidence).  We overrule appellant=s third issue.

III.      Appellant
Fails to Show Ineffective Assistance of Counsel

In his fourth issue, appellant claims that his trial
counsel was ineffective for failing to re-offer a videotaped statement to the
police, which would have shown appellant=s arms and his
tattoos as they were on the day he was arrested.  

A.      Standard
of Review

In reviewing an ineffective assistance of counsel claim, we
follow the test laid out in Strickland v. Washington, 466 U.S. 668
(1984).  To show ineffective assistance, an appellant must show 1) that counsel=s representation
was deficient, falling below the standard of prevailing professional norms, and
2) a reasonable probability that the result of the proceeding would have been
different but for trial counsel=s deficient performance.  Id. at
687B96;  Salinas v.
State, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005).  

A strong presumption exists that counsel=s conduct was
within the wide range of reasonable professional assistance.  Salinas,
163 S.W.3d at 740.  An allegation of ineffectiveness must be firmly founded in
the record, and the record must affirmatively demonstrate the alleged
ineffectiveness.  McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim.
App. 1996).  When no specific reason is given for counsel=s decisions, a
record on direct appeal will rarely contain sufficient information to evaluate
an ineffective assistance claim.  See Bone v. State, 77 S.W.3d 828, 833
(Tex. Crim. App. 2002); Thompson v. State, 9 S.W.3d 808, 813B14 (Tex. Crim.
App. 1999).  Further, when counsel has not been afforded an opportunity to
explain his or her decisions, we do not find deficient performance unless the
challenged conduct was so outrageous that no competent attorney would have
engaged in it.  See Goodspeed v. State, 187 S.W.3d 390, 392 (Tex. Crim.
App. 2005).








Once deficiency has been found, the appellant must show a
reasonable probability that but for counsel=s unprofessional
errors, the result of the proceeding would have been different.  Strickland,
466 U.S. at 694.  A reasonable probability is one sufficient to undermine
confidence in the outcome.  Id.  

B.      Second Strickland
Prong Is Not Satisfied 

Prior to the presentation of the defense testimony, a
hearing was held on the State=s motion in limine to exclude admission of
the videotaped statement appellant gave to police after his arrest.  Defense
counsel alternatively urged admission of only the video portion of the tape to
allow the jury to see appellant=s arms with tattoos on them at the time of
his arrest.  The trial court granted the State=s motion in
limine.  Appellant=s counsel did not re-offer the videotape
during the trial.  After the close of all the evidence, and before the charge
conference, the trial judge had a conference with both attorneys where he
clarified to appellant=s attorney that his prior ruling, that the
videotaped statement would not be admitted, did not mean that it could not be
admitted if the door had been opened by the State.  Appellant=s attorney said
that he understood this, and he said, AAnd we would ask
that the videotape still be shown to the jury because I believe the door was
opened.@  The court agreed
that the door had been opened, but no more was done to offer the videotape. 

Normally, the appellate record is insufficient to show
deficient performance by a trial attorney, because there is nothing in the
record as to the attorney=s reasons for the action or inaction.  Thompson,
9 S.W.3d at 813B14.  However, in this case, because of the
bench conference on the record, there is at least some evidence that appellant=s trial counsel,
after the close of the evidence, and in light of the trial judge=s statements,
reconsidered his strategy regarding the videotape and at that point believed
the jury should see the videotape.   








But even assuming that trial counsel=s performance was
deficient, the second Strickland prong has not been satisfied.  The
videotape showing tattoos on appellant=s arms is not
directly contradictory to any testimony by any eyewitness.  The complainants
did not say the assailant did not have tattoos; rather they said they did not
notice any tattoos on the assailant=s arms, as they
were focusing on the assailant=s face.  We have viewed the videotape that
is part of the appellate record.  The tattoos on appellant=s arms were barely
visible in the video; the video certainly did not show that the tattoos were so
prominent as to cast doubt on the eyewitness identifications.  Jimenez
testified that he focused on the man=s face rather than
his body, that he was very frightened, and that he was only able to look at the
robbers for a short time because after the complainants were taken to the
bedroom, the robbers would not allow the complainants to look at them. 
Hernandez similarly testified that he saw the men=s faces clearly as
they entered the apartment, and as they came toward the bedroom where he was,
but that after that he was made to lie face-down on the floor.  Marcos=s chance to
observe the robbers was limited to the time between their entering the room and
their telling the victims to lie face-down.  Given the fact that the tattoos do
not impeach any witness=s testimony, the video barely shows any
tattoos at all, all three witnesses made unequivocal identifications of
appellant, and all three saw appellant clearly, we cannot say that there is a
reasonable probability that a different result would have followed if appellant
had offered the videotape.  We overrule appellant=s fourth issue.

IV.      Motion
for Mistrial Based on Prosecutor=s Comment on
Failure to Testify

In his final issue, appellant contends that the trial court
reversibly erred in overruling appellant=s motion for
mistrial after the prosecutor, during the punishment phase closing argument,
commented on appellant=s failure to testify and failure to show
remorse.

A.      Standard of Review and Applicable Law

We review a trial court=s refusal to grant
a mistrial under an abuse of discretion standard. Simpson v. State, 119
S.W.3d 262, 272 (Tex. Crim. App. 2003).   An abuse of discretion occurs when
the trial court's decision falls outside the zone of reasonable disagreement.  Zuliani
v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).  The facts of each
case must be examined in deciding whether to grant a mistrial.  Wood v.
State, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000).  








Determining if the prosecutor=s statement was a
comment on the defendant=s refusal to testify requires looking at
the statement from the standpoint of the jury, and deciding whether the
implication that the language used had reference to such failure to testify is
a necessary one.  Swallow v. State, 829 S.W.2d 223, 225 (Tex. Crim. App.
1992).   The test is whether the language used was manifestly intended or was of
such a character that the jury would necessarily and naturally take it as a
comment on the defendant's failure to testify.  Bustamante v. State, 48
S.W.3d 761, 765 (Tex. Crim. App. 2001).  Implied or indirect allusions to the
failure to testify are not enough.  Id.  However, language that points
to evidence only the defendant can supply is error.  Swallow, 829 S.W.2d
at 225.  

Direct testimony as to contrition or remorse can only come
from the accused, and when offered by witnesses other than the accused himself,
is inadmissible.  Id. (citing
Thomas v. State, 638 S.W.2d 481 (Tex. Crim. App. 1982)).  However,
evidence from which the jury can glean a lack of remorse may come from other
sources besides the accused, and a reference to such evidence does not naturally
and necessarily lead the jury to understand it to be a comment upon the
defendant=s failure to testify.  See Caldwell v. State,
818 S.W.2d 790, 800 (Tex. Crim. App. 1991), overruled on other grounds by
Castillo v. State, 913 S.W.2d 529, 533 (Tex. Crim. App. 1995).  

Even a clear comment on the defendant=s failure to
testify is not error where the comment was invited by the defense=s closing
argument.  See Long v. State, 823 S.W.2d 259, 269 (Tex. Crim. App.
1991); Nethery v. State, 692 S.W.2d 686, 703 (Tex. Crim. App. 1985). 
The Court of Criminal Appeals has suggested that in order to invite a comment
on the failure to testify, defense counsel must argue in favor of his client
based on his client=s failure to testify, or attempt to
explain away or otherwise minimize the defendant=s failure to
testify.  Franks v. State, 574 S.W.2d 124, 127 (Tex. Crim. App. 1978). 
An invited argument must stay within the scope of the defense counsel=s invitation.  See
Johnson v. State, 611 S.W.2d 649, 650 (Tex. Crim. App. 1981); Kincaid v.
State, 534 S.W.2d 340, 341B42 (Tex. Crim. App. 1976).  








Determining whether a court abused its discretion in
refusing to grant a mistrial involves most, if not all, of the same
considerations that attend a harm analysis.  Hawkins v. State, 135
S.W.3d 72, 77 (Tex. Crim. App. 2004).  The analysis is conducted in light of
any curative instruction from the trial court, and a mistrial will only be
required in those extreme circumstances where the prejudice cannot be cured.  Id. 
When the motion for a mistrial is based on a comment on the defendant=s failure to
testify, we examine:  (1) the severity of the misconduct (the magnitude of the
prejudicial effect of the prosecutor=s remarks); (2)
measures adopted to cure the misconduct (the efficacy of any cautionary
instruction by the judge); and (3) the certainty of conviction or punishment
(the strength of the evidence supporting the conviction  or punishment).  See
Archie v. State, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007).  

B.      Analysis

The following transpired during the closing argument at the
punishment phase:

[Defense:]    Jonathan Williams= life C he=s not going to be a young man anymore when he gets
out. And when he=s in TDC, I guarantee you he=s going to think every day about
what he did and what happened in court this week and why he=s in there.

I=m asking you this, ladies and
gentlemen, don=t throw his life away.  Don=t C he=s going to be punished.  He=s going to TDC.  He=s going to do hard, hard time.  Don=t throw this life away.  We don=t know if it=s capable of being saved.  We don=t know enough about Jonathan
Williams.  It was
a horrible crime, yes ...

***








[State:]         Jonathan Williams
may be 23 years old, but from the judgments and stipulations introduced
Jonathan Williams has made a career out of being a criminal.  He=s 23 years old and you have five
judgments in front of you, two of which are felony convictions.  I want to talk
to you about Jonathan Williams= criminal history.  And defense counsel is right.  This is all you
know about Jonathan Williams.  But Jonathan Williams just had an opportunity,
ladies and gentlemen, to tell you more.  He had an opportunity to bring you
more about hisCabout himself, about his life.  He
had an opportunity to express his remorse to you about the crime that he=s committed if he feels it.  And he
chose not to do so.  That should tell you something C 

[Defense:]    Objection, Your Honor

[State:]         C about Jonathan Williams.

[Defense:]    That=s a comment on the defendant=s failure to testify.  

[Court:]        That=s sustained.  Ladies and gentlemen,
that=s sustained.  The instructions are
very clear that you cannot consider the fact that he did not testify in this
punishment phase of trial.

[Defense:]    And I move for a
mistrial.

[Court:]        And you cannot
consider it for any purpose whatsoever.

[Defense:]    Move for a mistrial,
Your Honor.

[Court:]        That=s overruled.

[State:]         I=m not asking you to consider the
failure of him to testify.  I=m just saying he had C

[Court:]        Let=s move along.

[State:]         C the opportunity to present evidence to
you.  

(emphasis
added).  

We note that appellant testified during the guilt stage. 
At the punishment phase, however, he did not testify, and he did not call any
family or friends to testify on his behalf.  The State argues that its closing
argument was an attempt to emphasize appellant=s failure to
present any evidence during the punishment phase of trial, and was not a
comment on appellant=s failure to testify.  See Thomas v.
State, 638 S.W.2d 481, 485 (Tex. Crim. App. 1982).  Further, the State
points out that its closing argument could have been reasonably interpreted to
be a comment on appellant=s testimony and demeanor when he testified
during the guilt phase of the trial.  See McGee v. State, 852 S.W.2d
551, 559 (Tex. App.CTyler 1992, pet. ref=d); Stewart v.
State, 995 S.W.2d 187, 190 (Tex. App.CFort Worth 1999,
pet. ref=d).  Appellant had
an opportunity during his testimony at the guilt phase to tell the jury more
about himself and his life, and he chose not to do so.  

We agree with the State that the portion of its closing
argument dealing with appellant=s failure to present the jury more
evidence about himself and his life was not of such a character that the jury
would necessarily and naturally take it as a comment on appellant=s failure to
testify during the punishment phase, and, therefore, that portion of the
argument was not improper.  See Bustamante, 48 S.W.3d at 765.  Further,
that portion of the State=s argument was proper as a direct response
to the defense argument that the jury Adid not know
enough about Jonathan Williams.@  See Franks, 574 S.W.2d at 127; Nethery,
692 S.W.2d at 703.  

However, the following portion of the State=s argument was
clearly an improper comment on appellant=s failure to
testify at the punishment phase: AHe had an
opportunity to express his remorse to you about the crime he=s committed if he
feels it.  And he chose not to do so.@[2]  The issue is
whether a mistrial is required as a result of this improper comment. 

The improper comment was brief and the State did not
emphasize the comment.  It is significant that the trial judge took prompt and
immediate measures to cure the misconduct.  He clearly instructed the jury, AThe instructions
are very clear that you cannot consider the fact that he did not testify in
this punishment phase of trial ... and you cannot consider it for any purpose
whatsoever.@  As the court alluded to, the instructions in the
charge also contained a clear and specific admonishment that the jury could not
refer to or allude to the fact that the defendant did not testify, nor take it
into consideration for any purpose whatsoever.  The jury was clearly and
purposefully instructed not to take the fact that appellant failed to testify
into account during their deliberations, and there is an appellate presumption
that the jury will obey the instructions to disregard, barring the most blatant
improprieties.  See Waldo v. State, 746 S.W.2d 750, 752B53 (Tex. Crim.
App. 1988). 








The comment by the prosecutor was meant to raise doubt in
the jury=s mind as to
whether appellant could be rehabilitated.  However, the State had presented
very strong evidence already that appellant was a habitual criminal who had
little hope of being rehabilitated because he had not been rehabilitated in the
past, despite five prior convictions.  The past crimes placed before the jury
were two misdemeanor drug possession convictions, followed by a criminal
trespass, followed by a felony drug possession and a felony drug possession with
intent to distribute.  In light of these prior convictions, which show a
failure to rehabilitate, the improper argument of the prosecutor during closing
argument probably had little effect on the punishment the jury assessed.  See
Archie, 221 S.W.3d at 700.  

Based on our analysis of the relevant factors, we hold that
the trial court did not abuse its discretion in overruling appellant=s motion for
mistrial.  Appellant=s first issue is overruled. 

Conclusion

We affirm the judgment.

 

/s/      Margaret Garner Mirabal

Senior Justice

 

 

Judgment
rendered and Memorandum Opinion filed September 25, 2007.

Panel
consists of Justices Anderson, Frost, and Mirabal.*

Do Not
Publish C Tex. R. App. P. 47.2(b).

 

 

 

 

 

 

*Senior Justice Margaret G. Mirabal sitting by
assignment.









[1]  Testimony was given through a Spanish language
interpreter.  However, it was discovered during Marcos=s examination that the complainants= first language is Nahuatl, a native American
language, and their second language is Spanish.  None of the victims spoke
enough English to testify without an interpreter.  





[2]  At the guilt phase, appellant denied committing the
offense.  The Aopportunity to express remorse@ clearly referred to the punishment phase.